1
2
3
4
5
6
7

HAEGGQUIST & ECK, LLP
ALREEN HAEGGQUIST (221858)
  alreenh@haelaw.com
AARON M. OLSEN (259923)
  aarono@haelaw.com
IAN PIKE (329183)
  ianp@haelaw.com
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878

8    Attorneys for Plaintiff and the Proposed Class

9                     UNITED STATES DISTRICT COURT

10              EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11   MARIA PILAR ORNELAS, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| 12 | **CLASS ACTION** |
| 13 | |
| Plaintiff, | COMPLAINT |
| 14 | |
| v. | |
| 15 | |
| 16   CENTRAL VALLEY MEAT CO., INC., a California Corporation. | |
| 17 | |
| Defendant. | |
| 18 | DEMAND FOR JURY TRIAL |

HAEGGQUIST & ECK, LLP

Plaintiff Maria Pilar Ornelas ("Ms. Ornelas" or "Plaintiff"), by her attorneys, brings this action individually and on behalf of all others similarly situated (the "Class") against Defendant Central Valley Meat Co., Inc. ("Central Valley Meat" or "Defendant"). Plaintiff makes the following allegations upon information and belief (except those allegations as to Plaintiff or her attorneys, which are based on personal knowledge), based upon an investigation that is reasonable under the circumstances, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

**NATURE OF ACTION**

1.      In late 2019, a new coronavirus emerged, named severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).[1] This virus causes coronavirus disease 2019 ("COVID-19"), a respiratory illness that can cause serious health problems, including death. *Id.* The disease has particularly ravaged workers in low-income and minority-predominant industries. Meat processing facilities like Central Valley Meat, made the situation worse by, among other things, forcing sick employees to work and concealing outbreaks from others.

2.      Despite knowing the risks of COVID-19, including witnessing the closure of numerous other meat processing plants because of COVID-19, in callous disregard of the physical and emotional impacts of COVID-19 on its hundreds of employees, Defendant knowingly, by acts of deliberate and reckless commission and omission, exacerbated the spread – and the reasonable fear of spread – of COVID-19 among its employees and the surrounding community. Central Valley Meat deliberately chose, and continues to choose, profits over the health and safety of its employees and community.

3.      As early as March 2020, Central Valley Meat failed to prepare for COVID-19. Then, beginning in April 2020, Central Valley Meat silently hid the first cases of an outbreak at

---

[1]      *See Frequently Asked Questions*, Centers for Disease Control and Prevention (July 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics (last visited July 20, 2020).; *see also Meat and Poultry Processing Workers and Employers*, Centers for Disease Control and Prevention (July 09, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (last visited July 20, 2020).

HAEGGQUIST & ECK, LLP

its facility in Hanford, California, located in Kings County, while actively pressuring sick employees to report to work, infecting others.  Within weeks, Plaintiff, along with close to 200 workers at Defendant's Hanford facility, contracted COVID-19, with that number continuing to rise. The rampant spread of COVID-19 is directly attributable to Defendant's heartless economic decisions, which began in March 2020, and which continue through the present. Defendant disregarded substantial, inescapable evidence of rising infection levels among its workers; and implemented policies and practices, in plain violation of health and safety regulations and public health guidance, that facilitated rather than diminished the spread of COVID-19.

4.     The number of COVID-19 cases in Kings County exploded, and at the epicenter was Central Valley Meat's Hanford facility.  Lest there be any doubt that Central Valley Meat was responsible for the rapid increase of COVID-19 infections in Kings County through its willful misconduct, as of early May 2020, Central Valley Meat's single facility internally reported at least 161 cases of the county's reported 158 cases.  In other words, as of that date, Defendant's facility accounted for ***more than*** 100% of the total reported cases in the ***entire*** county of 150,000 people.



5.     As acknowledged by the Kings County Department of Public Health ("KCDPH"), the "significant increase in the number of coronavirus cases in Kings County was attributable in large part to the meat plant."  Defendant was in a position of authority over its workplace composed of essential workers from a vulnerable population. It had a duty to

HAEGGQUIST & ECK, LLP

implement effective measures to contain the spread of this highly infectious, deadly disease and not to be unlawfully lax and facilitate its spread.

6.      Central Valley Meat's policies and practices created or substantially assisted in the creation of actionable claims for public nuisance, negligence, wanton and reckless misconduct, and unfair and unlawful business practices. Central Valley Meat knew its conduct would cause substantial life-threatening, and entirely foreseeable yet preventable harms.

7.      If that were not enough, Central Valley Meat failed to confidentially maintain the private health information of Plaintiff and hundreds of other employees infected with COVID-19, and it recklessly disclosed that information in violation of their privacy rights. Through its policies, Defendant also discriminated against and interfered with disabled workers rights for protected leave and reasonable accommodations.

8.      To redress the harms suffered, Plaintiff, individually and on behalf of the Class and sub-classes defined herein below, brings claims for: (1) Public Nuisance; (2) Negligence; (3) Wanton and Reckless Misconduct; (4) Confidentiality of Medical Information Act ("CMIA"), California Civil Code §§56.20, *et seq*.; (5) disability discrimination and failure to accommodate in violation of the Fair Employment and Housing Act ("FEHA"), Government Code §12940(a) *et seq*.; (6) interference with the right to medical leave in violation of the Family Medical Leave Act ("FMLA") 29 U.S.C. §2601, *et seq*.; (7) interference with right to medical leave in violation of the California Family Rights Act ("CFRA"), Government Code §12945.2, *et seq*.; (8) Breach of the Implied Covenant of Good Faith and Fair Dealing; (9) California's Unfair Competition Law, Business & Professions Code §17200, *et seq*. ("UCL"); and (10) Declaratory Judgment, 28 U.S.C. §2201.

## JURISDICTION

9.      This Court has original jurisdiction over this action under 28 U.S.C. §1331. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

HAEGGQUIST & ECK, LLP

10.     This Court has personal jurisdiction over Plaintiff because Plaintiff is a citizen of and resides in California and she submits to the Court's jurisdiction for the purpose of this Complaint. This Court has personal jurisdiction over Defendant because it is incorporated in California, its headquarters and principal place of business is in California, and it does a substantial amount of business in California, including in this District. Defendant also intentionally availed itself of the laws and markets of this District through the use, promotion, sale, marketing, and/or production and distribution of products and services.

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the parties are at home in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also proper under 18 U.S.C. §1965(a), because Defendant transacts a substantial amount of its business in this District. Alternatively, venue is proper under 28 U.S.C. §1391(b)(3) because this Court has personal jurisdiction over Defendant.

## THE PARTIES

### Plaintiff Maria Pilar Ornelas

12.     Like many Central Valley Meat workers, Maria Ornelas is Latinx. Ms. Ornelas, originally from Michoacán Mexico, was raised in Orange County, California. She moved to Hanford, California in about 2013 where she has since resided.  Central Valley Meat hired Ms. Ornelas on June 4, 2018 to work in the position of "Saving Offal" at an initial wage of $11 per hour (minimum wage at the time).  In this position, Ms. Ornelas' job duties included separating offal (*e.g.*, livers, hearts, etc.) with a knife from the bovine carcass.  After about four months, Ms. Ornelas was promoted to the position of "Floater," where Ms. Ornelas covered shifts for other employees who were absent or on break doing various duties. On about December 9, 2019, Ms. Ornelas was promoted to Quality Control, wherein she primarily conducts lactic acid percentage checks.

13.     At times relevant to this Complaint, Ms. Ornelas infrequently left her house other than for work and necessities.  As detailed below, like hundreds of other employees, Ms. Ornelas was exposed to SARS-CoV-2 at Defendant's Hanford facility in April 2020 when she worked

HAEGGQUIST & ECK, LLP

near at least one worker who tested positive for COVID-19. Ms. Ornelas then became very ill on April 23, 2020 and tested positive for COVID-19 on April 28, 2020. As a result of her illness, Ms. Ornelas transmitted SARS-CoV-2 to her boyfriend, who tested positive for COVID-19 shortly after Ms. Ornelas. Defendant recklessly created a situation where Ms. Ornelas was destined to contract COVID-19 and pass it onto others.

14. Because of her COVID-19 disease, Ms. Ornelas needed a reasonable accommodation to take several days off work and an FMLA/CFRA leave of absence. Unfortunately, because of her needed accommodation for her disabling condition and taking protected leave, Defendant denied Ms. Ornelas incentive pay and bonuses she would have otherwise been entitled. Due to the pandemic, Defendant instituted a Bonus Appreciation Policy and an Attendance Incentive Policy which cause employees who do not work all hours in a scheduled week to lose incentive pay and bonuses. Employees suffer a negative consequence for failing to have perfect attendance, even if the sole reason for the failure of perfect attendance is infection with COVID-19 or for otherwise taking FMLA-protected leave. Ms. Ornelas suffered a negative consequence of losing incentive pay and bonuses for failing to meet Defendant's perfect attendance policy because she was forced to take time under the FMLA/CFRA and because of her disabling condition.

15. Similarly, Ms. Ornelas was punished by receiving points under Defendant's no-fault attendance policy, where Ms. Ornelas received points toward discipline for being absent, even though the absences were for being out of work due to her disabling condition from COVID-19 and protected FMLA/CFRA leave. Ms. Ornelas was also subject to FMLA/CFRA interference by Defendant's management, who coerced, threatened, and pressured Ms. Ornelas from utilizing protected leave, with threats that the company would not keep her job open if she took time off work.

**Defendant Central Valley Meat**

16. Defendant Central Valley Meat Co., Inc., is a private, for-profit California Corporation, with its principal place of business in Hanford, California. The company is

HAEGGQUIST & ECK, LLP

reportedly the seventh-largest beef packer and processing company in the United States.  The company employs over 900 people, processes over 1,500 heads of cattle a day, and operates two facilities, one in Hanford, California, and another in Vernon, California.  This case concerns Central Valley Meat's facility in Hanford (the "Hanford Plant"), where about 750 of Central Valley Meat's 900 employees work. The Hanford Plant sits in rural Kings County, California, which has a population of about 150,000 people.

17.     Defendant is an entity engaged in an industry affecting commerce with more than 50 employees on each working day in each of the 20 or more calendar weeks in the current and preceding calendar year.  As such, Defendant is a covered entity under the ADA because it is an employer as defined by 42 U.S.C. §12111(2) and 29 C.F.R. §1630.2(b). *See* 42 U.S.C. §12111(5)(A); 29 C.F.R. §1630.2(e)(1).  Defendant is also an employer within the meaning of the FMLA, 29 U.S.C. §2601, *et seq*., the CFRA, Government Code §12945.2, *et seq*., and the FEHA, Government Code §12900, *et seq.*

18.     The following employees, among others, are relevant players in this case: (1) Juana Lacey (Human Resources), (2) Shelly Cunnings (Manager of Supervisors), (3) Terri Hall (Ms. Ornelas' direct supervisor), (4) Aleksandra Hernandez (Previous Lead, now supervisor), and (5) Francisco Pina (Lead). Defendant's unlawful conduct as alleged herein was authorized, approved, and/or adopted by Defendant's officers, directors, and/or managing agents, and it was done with malice, oppression, and/or fraud.

## EXHAUSTION OF REMEDIES

19.     On July 22, 2020, Ms. Ornelas filed a charge of discrimination with the California Department of Fair Employment and Housing ("DFEH").  That same day, the DFEH closed Ms. Ornelas's case and issued a Right-To-Sue Notice.  Therefore, Ms. Ornelas has exhausted his administrative remedies.  A true and correct copy of the charge and notice is attached hereto as **Exhibit 1**.

HAEGGQUIST & ECK, LLP

## FACTUAL ALLEGATIONS

### About Central Valley Meat

20.    Central Valley Meat's Hanford Plant is a slaughterhouse and a beef packaging facility.  For years, the company proudly displayed a logo on the front cover of its Employee Handbook of a smiling rabbit luring an unsuspecting cow by a rope into the slaughterhouse where the cow will be stunned, suspended by its hind legs, bled, skinned, decapitated, and ultimately butchered into pieces and packaged for sale.



21.    Unlike the logo, cattle do not happily prance along *en route* to death and dismemberment.  In 2012, the United States Department of Agriculture ("USDA") briefly shut down Central Valley Meat's Hanford Plant after receiving an undercover video purporting to show animal abuse, including cows being repeatedly shocked, and some cows unable to walk, before being slaughtered.[2]  The claimed mistreatment of cows caused California burger chain In-N-Out to sever ties with Central Valley Meat.  As for the slaughtering process, large cows enter at one end, and small cuts of meat leave at the other end, as depicted in the following graphic:[3]



---

[2]    *See Feds Close Central Valley Slaughterhouse*, NBC Los Angeles, https://www.nbclosangeles.com/news/local/feds-close-central-valley-slaughterhouse-central-california-central-valley-meat-company/1932520/(last visited July 20, 2020).
[3]    The graphic is for illustrative purposes only to visualize the slaughtering process and workflow at issue.

HAEGGQUIST & ECK, LLP

22.     In between the entry and exit points are hundreds of minimum wage workers. Central Valley Meat's workforce largely consists of low-income, minority and immigrant workers (primarily Latinx), who typically keep quiet about working conditions.  Unfortunately, with its endless goal of higher volume and greater efficiency, the company's profits take priority over the workers' health, safety, and most basic rights.  Workers in this high turnover industry typically work long overtime hours in close contact with many other employees doing work that is both physically and mentally exhausting.

23.     With thin profit margins, volume is everything. Central Valley Meat pressures its employees to work through all conditions and never miss a minute of work. The company instituted a company-wide, point-based performance system wherein employees receive points for tardiness or absences, even for protected and/or excused absences ("No-Fault Attendance Policy"). For example, employees receive one point for being late, two points for calling off work, and three points for a no-call/no-show. Once an employee reaches 18 points, he or she is subject to termination, even if the points were accrued from absences that were protected and/or excused. As discussed below, this common company-wide No-Fault Attendance Policy not only pressures sick employees to report to work, but it violates several laws, including, *inter alia*, the American with Disabilities Act ("ADA"), FEHA, FMLA, and CFRA.

24.     In addition, in response to the pandemic, Central Valley Meat instituted two policies whereby employees lost eligibility for incentive pay and bonuses for missing even a single hour of work in a pay period, regardless of the reason for the absence, including COVID-19-related reasons. Specifically, beginning on or around April 26, 2020 through at least May 30, 2020, Central Valley Meat instituted an "Appreciation Bonus" of $100 per week ($200 per pay period) for employees who worked all available hours each week ("Bonus Appreciation Policy").  If employees missed any hours of work, even for being sick or disabled by COVID-19, employees did not receive the bonus.  Similarly, on or around June 2, 2020, Central Valley Meat implemented an "Attendance Incentive" policy, whereby employees lost $2.50 per hour for every scheduled hour not worked, even if the reason for missing work was because the

employees were sick or disabled with COVID-19 ("Incentive Pay Policy").  As described below, instituting the Bonus Appreciation Policy and Incentive Pay Policy were not only in direct defiance of governmental guidance due to causing sick employees to report to work during a pandemic, but they also resulted in violations of, *inter alia*, the ADA, FEHA, FMLA, and CFRA.

25.     In short, due to the workers' vulnerable status and the pressure exerted by the company, Central Valley Meat's employees are conditioned to silently work through hazardous conditions if they want to remain employed, and they are encouraged to work even if they are sick.  The work environment created by Central Valley Meat is relevant to its flagrantly wanton and reckless response to the COVID-19 pandemic, and the unfortunate, sad, and harmful outcome for its workers and the surrounding community.

### The COVID-19 Pandemic

26.     As of July 20, 2020, in less than a six-month period, the number of COVID-19 cases surpassed 14 million globally, with more than 600,000 reported associated deaths. As of that date, the number of reported deaths in the United States alone related to COVID-19 exceeded 140,000 – far more than any other country in the world.[4]  The seriousness of COVID-19 cannot be understated.

27.     COVID-19 is a highly contagious disease. COVID-19 most commonly spreads through close interaction with an infected person that allows the virus to spread through airborne particles or aerosolized droplets, which are secretions from talking, coughing, and sneezing; or through contact with a contaminated surface.  The risk of infection increases dramatically when individuals are in proximity, *e.g.*, within six feet of each other, particularly indoors and for extended periods of time. The risk of infection increases exponentially for those in contact with infected persons who sneeze or cough or otherwise project secretions into the air.  Recent research published by the Centers for Disease Control and Prevention ("CDC") suggests that a

---

[4]     *See John Hopkins University & Medicine*, Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited July 20, 2020).

9

Case No.

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

single person with COVID-19 is likely to infect five or six other individuals absent aggressive physical distancing practices.[5]

28.     For several structural reasons, COVID-19 disproportionately burdens minority populations, including Latinx people, compared to other racial and ethnic groups.  The CDC attributes COVID-19's disparate racial impact in part to the fact that high populations of such minority groups are employed in essential services industries, such as working in meat processing facilities, compared to only 16% of white workers.  According to the CDC, Latinx workers, such as Ms. Ornelas, have lower rates of access to paid sick leave than white workers, and workers who lack paid sick leave are more likely to continue working even when they experience signs of illness.[6]

29.     The following facts and timeline illustrate Central Valley Meat's notice of the consequences associated with COVID-19 and demonstrate the company's gross indifference to the health and safety of its employees and community:

(a)     On January 8, 2020, the CDC issued its first public alert about COVID-19.

(b)     A few weeks later, on January 20, 2020, the first known case of COVID-19 was reported in the United States.

(c)     A few days later, the first known case in California was reported in Orange County.  Within weeks, the first known death from COVID-19 in the United States was reported – a women in San Jose, California.

---

[5]     Seven Sanche, *High Contagiousness and Rapid Spread of Severe Acute Respiratory Syndrome Coronvirus 2,* Centers for Disease Control and Prevention, https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article?deliverName=USCDC_333-DM25287 (last visited July 20, 2020).

[6]     *See COVID-19 in Racial and Ethnic Minority Groups*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html (last visited July 20, 2020).

Case No.

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

(d) A global pandemic ensued, and on March 4, 2020, California's Governor declared a state of emergency concerning COVID-19.[7]

(e) A little over a week later, on March 13, 2020, the President of the United States declared a national emergency concerning COVID-19.[8]

30. Because of the rapid spread of COVID-19 and related threats, on March 19, 2020, California Governor Gavin Newsom issued a Stay Home Order (Executive Order N-33-20) ("Stay Home Order").[9] The same day the State Public Health Officer and Director of the California Department of Public Health entered a similar order.[10] The Stay Home Order directed "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal infrastructure sectors ["Essential Workers"], as outlined at *Identifying Critical Infrastructure During COVID-19*, Cybersecurity & Infrastructure Security Agency (May 28, 2020), available at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. ("CISA"). *Id.* CISA identified 16 critical infrastructure sectors, one of which is the "Food and Agriculture Sector," which includes "livestock" "slaughter facilities" and the production of food packaging. As such, because the Hanford Plant operates within the critical infrastructure, Central Valley Meat did

---

[7]  *See Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of COVID-19*, Office of Governor Gavin Newsom (March 04, 2020), https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/ (last visited July 20, 2020).

[8]  *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (March 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited July 20, 2020).

[9]  *See Executive Order N-33-20*, Executive Department State of California, (March 04, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf (last visited July 20, 2020).

[10]  Sonia Y. Angell, M.D., M.P.H., *Order of the State Public Health Officer*, (March 19, 2020) https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Health%20Order%203.19.2020.pdf (last visited July 20, 2020).

HAEGGQUIST & ECK, LLP

1    not shut down operations and it continued to require its employees to "report to work for their

2    normal shift and times."

3        31.    Notably, CISA guidance is not binding and it is not an executive action.  It is

4    only "advisory in nature" and it "is not, nor should it be considered, a federal directive or

5    standard."[11]  Similarly, nothing in the Governor's Stay Home Order mandates Essential Workers

6    to continue reporting to work during the pandemic – it simply exempts such workers from

7    sheltering in place at home for work-related reasons.  Per CISA, despite its advisory list of

8    Essential Workers, it strongly advised that any decisions informed by its list must "take into

9    consideration additional public health considerations based on the specific COVID-19-related

10   concerns of particular jurisdictions." *Id*.

11       32.    As set forth below, because of Central Valley Meat's specific directives and

12   working conditions, serious risks of COVID-19 permeated the Hanford Plant and severely

13   heightened mitigation efforts should have been immediately implemented.

14       33.    Unfortunately, not only did Central Valley Meat negligently fail to meet certain

15   minimum safety requirements, but it intentionally engaged in willful misconduct that it knew

16   would, and in fact did, exacerbate the spread of COVID-19 and endanger the lives of its workers

17   and the community.  Central Valley Meat breached its duty of "ensuring the health, safety, and

18   well-being of our employees, and of the people living and working in communities near our

19   facilities."  Employee Handbook, pg. 12.

20   **General Duty to Make the Workplace Safe and Healthy in Response to COVID-19**

21       34.    Under the General Duty Clause of the Occupational Safety and Health Act of

22   1970, employers are required to provide their employees with a place of employment that is

23   "free from recognized hazards that are causing or are likely to cause death or serious physical

24

25   ─────────────────────

26   [11]    Christopher C. Krebs, *Advisory Memorandum of Identification of Essential Critical
     Infrastructure Workers During COVID-19 Response,* (April 17, 2020),

27   https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essenti
     al_Critical_Infrastructure_Workers_3.pdf (last visited July 20, 2020).

28

HAEGGQUIST & ECK, LLP

harm." 29 U.S.C. §654(a)(1). California similarly mandates that every "employer shall furnish a place of employment that is safe and healthful for the employee therein."  Cal. Labor Code §6400(a); *see also* Cal. Labor Code §6403(b) and (c) (no "employer shall fail or neglect … [t]o do every other thing reasonably necessary to protect the life, safety, and health of employees."); Cal. Labor Code §6404 ("No employer shall occupy or maintain any place of employment that is not safe and healthful.")

35.    Accordingly, on March 9, 2020, the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") issued "Guidance on Preparing Workplaces for COVID-19" to educate employers about COVID-19 to ensure they are meeting minimum requirements to provide a safe and healthful workplace.[12]  Likewise, on April 9, 2020, the CDC published "Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)."[13]  The CDC, in accordance with OSHA, advised that minimum workplace controls should be implemented to protect against the spread of SARS-CoV-2, including, *inter alia*:

      (a)     daily prescreening for COVID-19 symptoms;

      (b)     regular monitoring for COVID-19 symptoms;

      (c)     face coverings;

      (d)     implementing measures to maintain social distancing of six feet, staggering work shifts, and allowing telework where possible;

      (e)     routine disinfecting and cleaning of workspaces;

      (f)     increased ventilation;

HAEGGQUIST & ECK, LLP

---

[12]    *See U.S. Department of Labor Offers Guidance for Preparing Workplaces for Coronavirus*, U.S. Department of Labor, https://www.dol.gov/newsroom/releases/osha/osha20200309, (last visited July 20, 2020).
[13]    *See Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control and Prevention (May 06, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html (last visited July 20, 2020).

(g)  providing accurate information to employees about COVID-19, including how it spreads and risks of exposure;

(h)  training employees on proper hand washing practices and other preventative measures;

(i)  providing access to soap and water and alcohol-based hand sanitizers throughout the work area, and allowing breaks to allow employees to wash their hands and clean workstations;

(j)  immediately sending sick employees home;

(k)  not requiring employees to produce a positive COVID-19 test or healthcare note for employees to take sick leave;

(l)  flexible leave policies to allow employees to stay home, particularly by creating non-punitive sick leave policies;

(m)  identifying exposure through contact tracing by reviewing contacts over the 48 hours before symptoms of the disease emerged;

(n)  requiring employees with COVID-19 symptoms and/or diagnosed with COVID-19 to self-quarantine for designated periods; and

(o)  immediately notifying other co-workers of possible COVID-19 exposures while maintaining confidentiality of the name and personal health-related information of the worker who tested positive.[14]

---

[14]  *See When You Can be Around Others After You Had or Likely Had COVID-19*, Centers for Disease Control and Prevention (July 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprevent-getting-sick%2Fwhen-its-safe.html (last visited July 20, 2020); *see also What to Do If You Are Sick*, Centers for Disease Control and Prevention (May 08, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (last visited July 20, 2020); *Guidance for Preparing Workplaces for COVID-19*, U.S. Department of Labor Occupational Safety and Health Administration, https://www.osha.gov/Publications/OSHA3990.pdf (last visited July 20, 2020); *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings*, Centers for Disease Control and Prevention (July 17, 2020) https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html (last visited July 20, 2020).

HAEGGQUIST & ECK, LLP

36.    Specific to workers who experienced COVID-19-related symptoms, the CDC advised that the worker be immediately sent home to self-isolate until three days with no fever without use of fever-reducing medicines, symptoms have improved, and 10 days have elapsed since symptoms first appeared.[15]  If a worker tested positive for COVID-19, the worker should self-isolate until three days with no fever without use of fever-reducing medicines, symptoms have improved, 10 days have elapsed since symptoms first appeared, and the worker has received two negative results of SARS-CoV-2 from at least two consecutive respiratory specimens collected at least 24 hours apart.[16]

37.    To ensure these minimum safety precautions were instituted by employers without fear of running afoul of anti-discrimination laws, both the federal Equal Employment Opportunity Commission ("EEOC") and California Department of Fair Employment and Housing ("DFEH") expressly advised that during the pandemic, employers may, among other things (a) ask employees if they are experiencing COVID-19 symptoms; (b) send employees home if they display COVID-19 symptoms; (c) require employees to wear personal protective equipment (*e.g.*, face coverings); (d) conduct certain medical examinations (*e.g.*, temperature screens); and (e) and notify employees of a positive COVID-19 result in a way that does not reveal the personal health-related information of the employee, without running afoul of the anti-discrimination laws.[17]

---

[15]    *See When You Can be Around Others After You Had or Likely Had COVID-19*, Centers for Disease Control and Prevention (July 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprevent-getting-sick%2Fwhen-its-safe.html (last visited July 20, 2020).

[16]    *See Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings*, Centers for Disease Control and Prevention (July 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html, (last visited July 20, 2020).

[17]    *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, U.S. Equal Employment Opportunity Commission (June 17, 2020), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws; *see also DFEH Employment Information on COVID-19*, https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2020/03/DFEH-Employment-Information-on-COVID-19-FAQ_ENG.pdf (last visited July 20, 2020).

Haeggquist & Eck, LLP

15

Case No.

38.     Central Valley Meat could have abided by these guidelines while still fulfilling its role as a part of the essential infrastructure of supplying food during the pandemic.  Central Valley Meat was not helpless to prevent the harm caused by SARS-CoV-2 spreading through its facility. Rather, it made deliberate decisions it knew would exacerbate, rather than diminish, the spread of the virus.

**Heightened Health and Safety Requirements for the Meat Processing Industry During the Pandemic**

39.     By March 2020, the meat and poultry processing industry nationwide were on notice of the increased risk of potential exposure to SARS-CoV-2 due to the nature of the industry.  Numerous cases were reported in the media around the country in meat processing facilities, highlighting the heightened risk of SARS-CoV-2 exposure in the industry.  Notice of the serious concerns in the industry bore out to be true. As of July 21, 2020, according to data collected by the Food & Environment Reporting Network ("FERN"), at least 504 meat packing and food processing plants have confirmed cases of COVID-19, with 45,945 workers having tested positive for COVID-19, and 188 related deaths.[18]

40.     Beginning on March 31, 2020, several of the country's largest meat processing companies began to temporarily shut down, suspend, and or cut production, at their plants due to COVID-19 cases, including, without limitation:

(a)     JBS USA on March 31, 2020, and again on April 14, 21, 22, and 27, 2020;

(b)     Sanderson Farms on April 2, 2020;

(c)     Cargill on April 7, 2020, May 5, and May 21, 2020;

(d)     Maple Leaf Foods, Inc. on April 8, 2020;

(e)     West Liberty Foods on April 9, 2020;

(f)     Smithfield Foods on April 10, 13, 16, 27, 2020;

(g)     National Beef Packing Co. on April 6 and 20, 2020;

---

[18]     *See Food & Environment Reporting Network,* https://thefern.org/2020/04/mapping-covid-19-in-meat-and-food-processing-plants/ (last visited July 20, 2020).

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

1

2

3

4

5

6

7

8

(h)    Burger's Smokehouse on April 17 and 20, 2020;

(i)    Hormel Foods on April 18 and 27, 2020;

(j)    Conagra Brands, Inc. on April 21 and 23, 2020;

(k)    Don Miguel Foods, LLC on April 21, 2020;

(l)    Tyson Foods, Inc. on April 7, 16, 22, 23, 24, 30, and May 1, 5, and 29, 2020;

(m)    Comfrey Prime Pork on April 23, 2020; and

(n)    Indiana Packers Corp on April 24, 2020, among others.[19]

41.    Because of the serious concern of COVID-19 cases in the industry, the CDC sought data concerning the number of COVID-19 cases and deaths from meat processing facilities across the nation, and between April 9-27, 2020, the CDC received data from 115 facilities in 19 states.[20]  The results show a heightened risk of exposure in the industry, with qualitative data identifying common characteristics among processing facilities and their workers that increase the risk of transmitting and acquiring SARS-CoV-2.  However, the factors contributing to increased risk are readily avoidable through various control measures, and none of the particular risk factors are insuperable from the work of processing and packaging meat for distribution and sale.  In sum, the CDC confirmed that the work environment of meat processing plants "may contribute substantially to [employees'] potential exposures" to SARS-CoV-2.[21]

42.    Due to these circumstances, as recognized by many of the large meat processing companies, at the first sign of an outbreak at a facility, the **only** non-negligent solution to ensure

---

[19]    *See Map: COVID-19 meat plant closures*, Meat + Poultry (June 23, 2020), https://www.meatpoultry.com/articles/22993-covid-19-meat-plant-map (last visited July 20, 2020).

[20]    *See COVID-19 Among Workers in Meat and Poultry Processing Facilities – 19 States, April 2020*, Centers for Disease Control and Prevention (May 08, 2020) https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e3.htm. (last visited July 20, 2020).

[21]    *See Meat and Poultry Processing Workers and Employers*, Centers for Disease Control and Prevention (July 09, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (last visited July 20, 2020).

the health and safety of workers and the surrounding community was to temporarily close, suspend, and/or cut production at the infected facilities to quarantine, deep clean and sanitize, create an assessment plan, and implement appropriate engineering and administrative control measures to prevent further infection.  Only then could the facilities reopen safely.  But, as set forth below, unlike the many other operators around the nation who suspended operations to keep their workers and communities safe, Central Valley Meat refused to cut or slow production or implement appropriate control measures despite mass infection at its facility.

43.    With respect to operating safely for open facilities, the CDC issued detailed, but non-exhaustive, guidance specific to meat processing employers, regarding what a reasonable assessment and control plan should include.[22]  Cal-OSHA also issued similar guidelines for the food processing and packing industry.[23]  In addition to the numerous other control measures identified by the CDC specific to meat processing employers, such employers should "analyze any incentive programs and consider modifying them, if warranted, so that employees are not penalized for taking sick leave if they have COVID-19."[24]  Central Valley Meat did precisely the opposite. As discussed below, Central Valley Meat egregiously failed to adhere to the most basic minimum safety guidelines. Instead, it took proactive measures that made the workplace **more** susceptible to the spread of the virus.

[22]    *See Meat and Poultry Processing Workers and Employers*, Centers for Disease Control and Prevention (July 09, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (last visited July 20, 2020).
[23]    *See COVID-19 Industry Guidance: Food Packing and Processing*, Cal-OSHA (July 02, 2020) https://covid19.ca.gov/pdf/guidance-food-packing.pdf (last visited July 20, 2020).
[24]    *See Meat and Poultry Processing Workers and Employers*, Centers for Disease Control and Prevention (July 09, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (last visited July 20, 2020).

HAEGGQUIST & ECK, LLP

18

Case No.

CLASS ACTION COMPLAINT

**Central Valley Meat Knowingly Placed its Employees and the Community in Danger by Failing to Implement Basic Safety Measures and Intentionally Deceiving Them About the Same**

44.     Central Valley Meat chose to put profits over the health and safety of its employees and community.  The company not only failed to follow multiple processes and procedures as outlined by the CDC and OSHA to provide the greatest safety measures possible for its employees, it intentionally deceived its employees and the community through omissions, and through false and deceptive representations.

45.     In light of heightened media attention focused on the industry, widespread plant closures, and the breadth of publicly available resources, by March 2020, Central Valley Meat was undisputedly on notice of a serious risk of SARS-CoV-2 infecting its Hanford Plant.  It was also fully informed of the steps it could have taken to eliminate that risk. In addition to the numerous pre-existing news reports about the spread of COVID-19 cases, on March 27, 2020, Central Valley Meat was on notice that SARS-CoV-2 had made its way into the small rural county where the company is located.  That day, KCDPH issued a press release notifying the public of a confirmed case of COVID-19 in the county.[25] In the following days, between March 27, 2020 and April 10, 2020, KCDPH issued at least seven additional press releases of more and more confirmed COVID-19 cases in the county, and on April 11, 2020, KCDPH reported the first COVID-19-related death in Kings County.  From there, the number of COVID-19 cases in Kings County exploded, with Central Valley Meat at the epicenter, as discussed further below.

46.     Based on information and belief, Central Valley Meat had its first reported positive case of COVID-19 as early as April 2, 2020, with three additional positive cases on April 16, 2020. By April 21, 2020, it is believed the company had at least nine (9) positive COVID-19 cases. Because positive cases were spread throughout different parts of its facility, and increasing, Central Valley Meat should have immediately suspended operations at its

---

[25]     *See Health Officials Confirm First Resident Case of COVID-19 and One Non-Resident Case,* Kings County Department of Public Health (March 27, 2020), https://www.countyofkings.com/home/showdocument?id=21397 (last visited July 22, 2020).

HAEGGQUIST & ECK, LLP

1  Hanford Plant and issued community-wide public notices.  At a minimum, it should have

2  immediately instituted robust mitigation and corrective measures.  But it did not. Instead, it took

3  certain contrary steps directly linked to conduct known to exacerbate, rather than mitigate, the

4  spread of SARS-CoV-2.

5        47.    Central Valley Meat's willful misconduct includes, without limitation:

6        (a)    intentionally failing to timely notify employees of their exposure to

7  COVID-19;

8        (b)    refusing to send home employees with COVID-19 symptoms;

9        (c)    pressuring employees who call in sick with COVID-19 symptoms to

10  report to work with threats of termination for job abandonment;

11        (d)    instituting a No-Fault Attendance Policy that pressures employees to

12  work even when they are sick, out of fear of earning points toward discipline;

13        (e)    instituting a Bonus Appreciation Policy and Inventive Pay Policy for

14  workers to lose incentive pay and/or bonuses for missing any work, even if it's because they are

15  sick or disabled because of COVID-19;

16        (f)    with the fast-paced production line, disenabling employees from taking

17  adequate breaks to wash their hands or otherwise allow for heightened cleaning and disinfecting

18  of the workstations;

19        (g)    refusing to implement adequate engineering controls to prevent the

20  spread of SARS-CoV-2 (*e.g.*, forcing employees to work in close proximity without adequate

21  masks, gloves, or facial shields and without sufficient or effective sanitization); and

22        (h)    allowing and pressuring workers exposed to SARS-CoV-2 and who test

23  positive for COVID-19 to return to work without proper quarantining, screening, monitoring,

24  and/or other protective measures.

25        48.    The most significant measures disregarded by Central Valley Meat include

26  timely notifying workers of positive COVID-19 cases, spacing workers at least six-feet apart

27

28

HAEGGQUIST & ECK, LLP

1    while working on the processing line and modifying workplace policies that pressure sick

2    employees to report to work.

3         49.    Indeed, it is believed Central Valley Meat allowed multiple employees to return

4    to work the day after they tested positive for COVID-19.  It is believed Central Valley Meat

5    knowingly allowed at least one employee to work up to five (5) additional days after testing

6    positive for COVID-19, with multiple other employees working varying numbers of days after

7    Central Valley Meat knew or should have known they had tested positive.  In fact, at least one

8    of the first workers to test positive was expressly told by Central Valley Meat to return to work

9    in only two (2) days, despite Central Valley Meat's clearly knowing this, it utterly failed to

10   comply with CDC's guidelines. In short, Central Valley Meat was and/or should have been

11   aware of employees working with COVID-19 symptoms and who had tested positive for

12   COVID-19.  Despite this knowledge, Central Valley Meat encouraged, and—even affirmatively

13   instructed—employees with COVID-19 symptoms to come to work; and it failed to timely warn

14   co-workers or institute adequate precautionary measures.  Under no reasonable interpretation

15   could Central Valley Meat's conduct be considered a normal part of the employment

16   relationship.

17        50.    In direct defiance of CDC guidance, Central Valley Meat did not immediately

18   notify employees of their possible exposure to COVID-19 after the first confirmed positive case

19   on April 2, 2020.  It likewise did not notify employees after the three additional positive cases

20   on April 16, or after the additional cases on April 17, 18, and 21, 2020.  Central Valley Meat

21   likely never would have notified its employees.  Fortunately, on April 21, 2020, a worker

22   discovered another co-worker had tested positive, so she posted to Facebook the following alert

23   with an all red background:



All CVM employees
Please safe we had a
comfired case please
wear your masks and
wash ur hands
Be safe family & friends

HAEGGQUIST & ECK, LLP

51.     As workers became increasingly concerned, and only after workers had taken matters in their own hands to notify each other of positive COVID-19 cases, Central Valley Meat belatedly notified employees on April 22, 2020 that it had a positive COVID-19 case.  The company deceptively stated that it had just learned "late yesterday" of two "Rib Line employees that have tested positive," when in reality, it is believed at least nine (9) employees had already tested positive, with the first being on April 2, 2020.

52.     The company was upset that employees had publicly advised one another about the positive COVID-19 case.  Central Valley Meat called into the office certain employees who commented on the Facebook post about the working conditions at the facility and threatened they could lose their job for talking about the working conditions. This is a blatant violation of Labor Code §218, which prohibits disciplining employees for disclosing information about the employer's working conditions.

53.     The number of COVID-19 cases in Kings County exploded, and at the epicenter was Central Valley Meat's Hanford Plant.  Indeed, as of April 2, 2020, the date of the first believed case of COVID-19 at the Hanford Plant, there were only five (5) reported COVID-19 cases in the county.  As of May 2, 2020, Kings County reported having a total of 158 cases, whereas it is believed there were at least 161 internally reported cases at Central Valley Meat. In other words, as of that date, Central Valley Meat's single facility accounted for more than 100% of total confirmed cases in the entire county.  The following graph, which was displayed above in the Complaint, evidences Central Valley Meat was responsible for the spike of COVID-19 cases in Kings County:



CLASS ACTION COMPLAINT

Case No.

HAEGGQUIST & ECK, LLP

54.    The number of cases continued to soar in Kings County, reaching 1,567 positive COVID-19 cases by June 8, 2020.  Comparing Kings County to the next county over, Madera County, which has the same population of about 150,865, it is beyond peradventure that Central Valley Meat is responsible for the significant increase in COVID-19 cases in Kings County. Even though Madera County had its first positive COVID-19 case over two weeks before Kings County, its numbers remained relatively flat, increasing to only 172 total cases by June 8, 2020, as compared to Kings County's 1,567 cases.



55.    The causal difference is clear – a single company, Central Valley Meat, was unlawfully negligent, engaged in willful misconduct endangering the lives of thousands, created a public nuisance, and caused dozens, if not hundreds, of people to become very sick and fearful of their health and safety.  There have been at least forty (40) COVID-19 related deaths in Kings County.

56.    Yet, through news media, Central Valley Meat continued to falsely publicize that they had been following CDC guidelines and "initiated multiple other processes and procedures to provide the greatest safety measures possible for our employees."[26]  In reality, the company was gravely endangering the community.

---

[26]    *See 138 employees at meat plant south of Fresno test positive for coronavirus*, Associated Press (May 07, 2020), https://ktla.com/news/california/138-employees-at-central-california-meat-plant-test-positive-for-coronavirus/ (last visited July 20, 2020).

HAEGGQUIST & ECK, LLP

1
2
3
4
5
6
7
8
9
10
11
12

HAEGGQUIST & ECK, LLP

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendant Exposed Plaintiff Ornelas to COVID-19 and She Became Very Sick and Disabled from COVID-19**

57.    Throughout her employment with Central Valley Meat, Ms. Ornelas endured long hours working on or around the production line that was fast, unforgiving, and physically and mentally exhausting. Because of the high employee turnover, like other employees, Ms. Ornelas felt the pressure exerted by the company to silently work through hazardous and hard conditions for fear of termination.

58.    On April 18, 2020, a co-worker advised Ms. Ornelas that another worker had tested positive for COVID-19, but that the company was still letting the employee work.  Ms. Ornelas and two other employees told their supervisor, Ms. Hall, what they heard, and Ms. Ornelas further advised Ms. Hall that Ms. Ornelas had come in close contact with an allegedly infected employee.  Ms. Hall advised them that it was just a "rumor," and no precautionary measures were taken to protect Ms. Ornelas or the other employees. Rather, the employee who was the subject of the so-called "rumor" was allowed to continue working without a face covering or precautions. Ms. Ornelas provided Ms. Hall with the names of two other workers believed to have been infected.

59.    Not believing it was just a rumor, Ms. Ornelas asked Ms. Lacey in HR whether any employees had COVID-19.  Even though it is believed several workers had already tested positive for COVID-19, like Ms. Hall, Ms. Lacey also denied any employees were at risk of COVID-19.

60.    Three days later, on April 21, 2020, during her lunch break, Ms. Ornelas learned that a co-worker posted on Facebook that an employee at Central Valley Meats had tested positive for COVID-19.

61.    Suddenly, on April 22, 2020, Central Valley Meats handed Ms. Ornelas a paper saying the company discovered two workers had tested positive the evening prior.  Ms. Ornelas immediately felt deceived by Defendant – a company that for the last several weeks had cared

24

1  more about its bottom line than the risks from COVID-19 and, as described above, created an

2  environment for SARS-CoV-2 to spread like wildfire.

3  62.    The following day, April 23, 2020, around 11:00 a.m. Ms. Ornelas began feeling

4  very sick while at work.  Ms. Ornelas was struggling to breath and she felt like she was

5  "suffocating."  She had also been experiencing headaches that were so severe that her vision

6  became blurry.  Accordingly, that morning, Ms. Ornelas asked the Lead, Mr. Pina, if she could

7  get a viral test, and after consulting with her supervisor, Ms. Hernandez, Ms. Ornelas was told

8  she would not be provided testing and testing was only being offered for employees chosen by

9  the company.

10  63.    Central Valley Meat refused to offer Ms. Ornelas a viral test or send her home

11  even though she had direct contact with an employee who tested positive for COVID-19 and she

12  was experiencing COVID-19 symptoms.  The company required Ms. Ornelas to finish her shift

13  until about 4:25 p.m., and by the time Ms. Ornelas arrived home, her face was bright red, she

14  was light-headed and struggling to breath, coughing, and she soon developed a fever of 103.7.

15  Ms. Ornelas also lost her sense of smell and taste.  Ms. Ornelas again notified Mr. Pino about

16  her condition and it was unlikely she would make it into work the next day because she was so

17  sick.  Not once at this time did Mr. Pino advise Ms. Ornelas to self-quarantine or that she was

18  not allowed into the workplace.

19  64.    The next morning, on April 24, 2020, Ms. Ornelas communicated with Ms.

20  Hernandez to let her know that she still had a fever and related COVID-19 symptoms. Ms.

21  Ornelas asked her if the health department could give Ms. Ornelas a test because she understood

22  the company had some of the other employees tested. Ms. Hernandez told Ms. Ornelas to contact

23  HR. Ms. Ornelas tried to contact HR with no success. As such, Ms. Ornelas advised Ms.

24  Hernandez that she could not reach HR despite her efforts.  Unbelievably, in response, Ms.

25  Hernandez simply told her it "looks like we will be working tomorrow."

26  65.    Ms. Ornelas ultimately reached Ms. Lacey who told her the company would not

27  offer to pay for or arrange viral testing for Ms. Ornelas.  Accordingly, Ms. Ornelas paid $225

28

Case No.

**CLASS ACTION COMPLAINT**

HAEGGQUIST & ECK, LLP

1    out of her pocket to get tested at the Urgent Care in Tulare, California.  Defendant does not

2    provide Ms. Ornelas with any health insurance, so she had to self-fund for medicine and

3    healthcare supplies.  Ms. Ornelas updated Ms. Lacey that she had gotten tested.  During this

4    process, while Ms. Ornelas was too disabled from her sickness to work, the company did not

5    advise Ms. Ornelas to self-quarantine or take any other precautionary measures relating to her.

6    Nor did the company attempt to contact trace, for example, by asking Ms. Ornelas with whom

7    she had come into close contact.  Likewise, Central Valley Meat did not initiate a workers'

8    compensation claim.

9        66.    Ms. Ornelas remained very sick for the next few weeks. In addition to suffering

10    physical illness, Ms. Ornelas suffered from emotional distress and fear that she had contracted

11    COVID-19 and its related symptoms and consequences.  She relatedly feared for her safety and

12    for the safety of those persons close to her.  She also feared returning to Defendant's unsafe

13    workplace.  Panic attacks are reportedly common among those who are infected and those who

14    fear becoming infected.

15        67.    On April 28, 2020, Ms. Ornelas' fears came true.  She received a call from the

16    medical clinic where she had been tested who advised she was positive for COVID-19.  Ms.

17    Ornelas was devasted, not only due to the diagnosis, but because of the danger for her 90-year

18    old grandmother, boyfriend, co-workers, and people close to her with whom she had come in

19    contact.  Indeed, Ms. Ornelas infected her boyfriend with COVID-19, who is still suffering

20    serious health issues such as damage to his nervous system from the disease.

21        68.    Ms. Ornelas continued to suffer emotional distress and fear regarding her then

22    current health and wellbeing and her future status due to the potential effects of COVID-19,

23    including reported serious long-term health complications such as lung inflammation, blood

24    clots, intestinal damage, heart inflammation, liver problems, neurological malfunction, nervous

25    system damage, acute kidney disease, and death.  To date, Ms. Ornelas continues to have severe

26    health problems, including trouble breathing, vision-blurring headaches, fevers, and overall

27    fatigue, which have caused her to, among other things, miss work without pay.

28

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

69.    Throughout the period of being disabled and absent due to COVID-19, Central Valley Meat's management pressured Ms. Ornelas to return to the workplace despite being sick, with comments such as, "I don't know if I can hold your job open" for being on sick leave.  Due to her disabling condition from COVID-19, Ms. Ornelas was forced to take unpaid FMLA/CFRA leave causing her to earn points toward discipline under Defendant's No-Fault Attendance Policy and lose incentive pay for missing work under Defendant's Incentive Pay Policy.

70.    While Central Valley Meat took some precautionary measures after the media blew up stories about the outbreak at the Hanford Plant, such as taking employee temperatures at the start of their shifts, its efforts are too little and too late.  The company continues to discourage employees from taking sick leave both expressly and through its Incentive Pay Policy and No-Fault Attendance Policy.  It also has not provided adequate and sufficient face coverings for employees, nor developed effective controls to ensure proper social distancing, cleaning, and disinfecting.  Similarly, Central Valley Meat does not adequately provide or enforce breaks to enable adequate handwashing and other sanitization procedures by employees.  It also is not adequately conducting contact tracing of all persons known or suspected to have been infected with COVID-19 while physically present at the Hanford Plant.  Based on information and belief, COVID-19 cases continue to be reported at the Hanford Plant.

**Central Valley Meat's Violation of Privacy Rights**

71.    Central Valley Meat created and maintains a "Master COVID Tracking List" (the "COVID LIST"), which contains the private, personal, and confidential health information of Ms. Ornelas and more than 800 hundred employees, including their names, addresses, phone numbers, birth dates, and COVID-19 diagnoses (the "PHI"). Central Valley Meat failed to inform Ms. Ornelas or the Class of the personal information to be collected (*e.g.*, COVID-diagnosis) or the purposes for which it shall be used.  Central Valley Meat also failed to obtain valid authorizations to obtain or use employees' medical information or implement and maintain reasonable security procedures and best practices appropriate to the nature of the information in

the COVID LIST to protect it from unauthorized access, destruction, use, modification, or disclosure, including by failing to maintain the list in its own separate, confidential location.

72.    Rather, based on information and belief, the COVID LIST has been disclosed, accessed, or otherwise made available to several people who have no business reason to access or review the COVID LIST. It is further believed the disclosed COVID LIST was not marked confidential, and it was not password protected or otherwise encrypted.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff realleges and incorporates herein by reference each allegation in the preceding and subsequent paragraphs.

74.    Plaintiff brings this action individually and on behalf of a class of similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.

75.    As used herein, the following terms have the meanings set forth below:

(a)    "Class Period" means the four years preceding the filing of this Complaint to the present.

(b)    "COVID-19 Pandemic" means SARS-CoV-2 outbreak that causes COVID-19 declared by the World Health Organization as a pandemic on March 11, 2020.

(c)    "FMLA Employees" means all workers who were employed by Defendant during the Class Period who were eligible for FMLA and/or CFRA leave within the meaning of 29 U.S.C. §2611(2) and/or Government Code §12945.2 (a).

76.    Plaintiff seeks to represent the following classes of persons:

(a)    **Sub-Class One**

All employees who worked at Defendant's Hanford Plant during the COVID-19 Pandemic.

(b)    **Sub-Class Two**

All FMLA Employees who were subject to Defendant's No-Fault Attendance Policy, Bonus Appreciation Policy, and/or Incentive Pay Policy during the Class Period.

HAEGGQUIST & ECK, LLP

(c)     **Sub-Class Three**

All employees who were absent from work because of a physical or mental disability and who earned points under Defendant's No-Fault Attendance Policy and/or lost incentive pay or bonuses because of Defendant's Bonus Appreciation Policy and/or Incentive Pay Policy because of his or her disability-related absence during the Class Period.

(d)     **Sub-Class Four**

All employees listed on Defendant's COVID LIST during the Class Period.

77.     Collectively, the four sub-classes are herein referred to as the "Class."

78.     Excluded from the Class are Defendant, their officers and directors, families, owners, and legal representatives, heirs, successors, or assigns, and any entity in which Defendant has a controlling interest, and any Judge assigned to this case and their immediate families.

79.     Plaintiff reserves the right to amend or modify the class definition in connection with their motion for class certification, because of discovery, at trial, or as otherwise allowed by law.

80.     Plaintiff brings this action individually and on behalf of all others similarly situated because there is a well-defined community of interest in the litigation and the proposed sub-classes are easily ascertainable.

**Numerosity**

81.     The potential members of the Class, and each of the sub-classes independently, are so numerous, joinder of all the members is impracticable. While the precise number of members of the Class, or each of the sub-classes, has not been determined, Plaintiff is informed and believes the Class, and each of the sub- classes, include at least a few hundred individuals.

82.     Based on information and belief, Defendant's records evidence the number and location of the Class, and each of the sub-classes, respectively.

**Commonality and Predominance**

83.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual class members. These common questions of law and fact include, without limitation:

(a)    Whether Defendant caused a public nuisance that caused special injury to Plaintiff and the Class;

(b)    Whether Defendant engaged in negligent conduct and its conduct caused harm to Plaintiff and the Class;

(c)    Whether Defendant engaged in wanton and reckless misconduct and its conduct caused harm to Plaintiff and the Class;

(d)    Whether Defendant violated the CCPA by failing to inform Plaintiff and the Class as to the categories of personal and medical information to be collected and the purposes for which such information shall be used;

(e)    Whether Defendant violated the CCPA by failing to implement or maintain reasonable security procedures or best practices appropriate to the nature of the information to protect it from unauthorized access, destruction, use, modification, or disclosure;

(f)    Whether Defendant violated the CCPA by disclosing Plaintiff's and the Class's private health information;

(g)    Whether Defendant violated the CMIA by failing to obtain valid authorizations from Plaintiff and the Class prior to receiving their medical information;

(h)    Whether Defendant violated the CMIA by disclosing Plaintiff's and the Class's medical information without a valid authorization;

(i)    Whether Defendant violated the ADA by failing to maintain Plaintiff's and the Class's health-related information on separate forms and in separate medical files;

(j)    Whether Defendant violated the ADA by disclosing Plaintiff's and the Class's health-related information;

HAEGGQUIST & ECK, LLP

1         (k)    Whether Defendant violated the ADA by instituting a no-fault attendance

2    policy whereby employees receive points toward discipline and termination for absences

3    irrespective of the reason for the absence, including as an accommodation for a disability;

4         (l)    Whether Defendant violated the ADA by instituting an Attendance

5    Incentive policy which penalizes employees who take time off work as an accommodation and

6    coerces and intimidates employees for exercising rights under the ADA;

7         (m)    Whether Defendant violated the ADA by coercing, intimidating,

8    threatening, and/or interfering with Plaintiff's the Class's exercising rights under the ADA;

9         (n)    Whether Defendant violated the FEHA by instituting a no-fault

10    attendance policy whereby employees receive points toward discipline and termination for

11    absences irrespective of the reason for the absence, including as an accommodation for a

12    disability;

13         (o)    Whether Defendant violated the FEHA by instituting an Attendance

14    Incentive policy which penalizes employees who take time off work as an accommodation and

15    coerces and intimidates employees for exercising rights under the FEHA;

16         (p)    Whether Defendant violated the FEHA by coercing, intimidating,

17    threatening, and/or interfering with Plaintiff's the Class's exercising rights under the FEHA;

18         (q)    Whether Defendant interfered with Plaintiff's and the Class's rights under

19    the FMLA by instituting a Bonus Appreciation Policy and/or an Attendance Incentive policy

20    which causes employees to suffer loss of incentive pay and/or bonuses for failing to meet a

21    perfect attendance where the reason for losing the incentive and/or bonus was for taking time

22    under the FMLA;

23         (r)    Whether Defendant interfered with Plaintiff's and the Class's rights under

24    the FMLA by counting FMLA leave under its no-fault attendance policy;

25         (s)    Whether Defendant interfered with Plaintiff's and the Class's rights under

26    the FMLA by discouraging Plaintiff and the Class from taking FMLA;

27

28

HAEGGQUIST & ECK, LLP

(t)     Whether Defendant interfered with Plaintiff's and the Class's rights under the CFRA by instituting a Bonus Appreciation Policy and/or an Attendance Incentive policy which causes employees to suffer loss of incentive pay and/or bonuses for failing to meet perfect attendance where the reason for losing the incentive and/or bonus was for taking time under the CFRA;

(u)     Whether Defendant interfered with Plaintiff's and the Class's rights under the CFRA by counting CFRA leave under its no-fault attendance policy;

(v)     Whether Defendant interfered with Plaintiff's and the Class's rights under the CFRA by discouraging Plaintiff and the Class from taking CFRA;

(w)     Whether Defendant breached the implied covenant of good faith and fair dealing;

(x)     Whether Defendant engaged in unfair or unlawful conduct in violation of the UCL;

(y)     Whether Defendant's conduct, carried out, approved and/or ratified by an officer, director or managing agent, was oppressive, malicious, and/or fraudulent; and

(z)     Whether Plaintiff and the Class have been harmed and the proper measure of relief.

**Typicality**

83.     The claims of Plaintiff are typical of the claims of the Class. Plaintiff and all members of the Class sustained injuries and damages arising out of and caused by Defendant's common course of conduct in violation of laws, regulations that have the force and effect of law, and statutes as alleged herein.

**Adequacy of Representation**

84.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Counsel who represents Plaintiff are competent and experienced in litigating large consumer and employment class actions.

HAEGGQUIST & ECK, LLP

**Superiority of Class Action**

85.    A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of the Class is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each member of the Class has been damaged and is entitled to recovery because of Defendant's uniform unlawful policy and/or practices described herein. There are no individualized factual or legal issues for the court to resolve that would prevent this case from proceeding as a class action. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**COUNT I**
**Public Nuisance**
**In Violation of California Civil Code §§ 3479, 3480, 3491, 3493, and Code of Civil Procedure §731**
**(On Behalf of Plaintiff and Sub-Class One)**

86.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if set forth in full herein.

87.    California Civil Code §3479 defines "nuisance" as "[a]nything which is injurious to health, … or is indecent or offensive to the senses, … so as to interfere with the comfortable enjoyment of life or property."

88.    California Civil Code §3480 defines "public nuisance" as any nuisance that "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

89.    To constitute a "public nuisance," the offense against, or interference with the exercise of rights common to the public must be substantial and unreasonable. *People ex rel. Gallo v. Acuna,* 14 Cal. 4th 1090, 1103-1105 (1997).

Case No.
CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

1    90.    The acts and omission of Defendant alleged herein substantially and

2    unreasonably created or assisted in the creation of the spread and transmission of COVID-19, a

3    life-threatening disease and infection, the risk of spread and transmission of COVID-19, and the

4    actual and real fear and anxiety of the spread and transmission of COVID-19, all of which

5    constitute actional public nuisance. *See, e.g.,* Restatement (Second) of Torts §821B & cmt. G

6    ("[T]he threat of communication of smallpox to a single person may be enough to constitute a

7    public nuisance because of the possibility of an epidemic …."); *Birke v. Oakwood Worldwide,*

8    169 Cal. App. 4th 1540, 1546 (2009) (secondhand smoke in condominium complex); *Cty. of*

9    *Santa Clara v. Atlantic Richfield Co.,* 137 Cal. App. 4th 292, 306 (2006).

10    91.    California Code of Civil Procedure §731 and California Civil Code §§3491,

11    3493, and 3495 authorize Plaintiff to bring this action for injunctive, equitable abatement, and

12    damages relief from Defendant.

13    92.    The public nuisance caused by Defendant as alleged herein has caused and will

14    continue to cause special injury to Plaintiff within the meaning of Civil Code §3493, because:

15        (a)    Plaintiff suffered from increased anxiety and fear of the unreasonably

16    heightened risk of exposure to SARS-CoV-2 she faced before she became infected with COVID-

17    19;

18        (b)    Plaintiff suffered from increased anxiety and fear of infecting fellow

19    workers, friends, and close family members with COVID-19 because of her heightened risk

20    exposure;

21        (c)    Plaintiff suffered from infection from COVID-19 and its related

22    symptoms and effects;

23        (d)    Plaintiff believed she in fact infected people close to her with COVID-

24    19, including, without limitation, her boyfriend, causing her additional fear and anxiety;

25        (e)    Plaintiff suffered increased anxiety and fear about future harms to her

26    health and well-being; and

27

28

HAEGGQUIST & ECK, LLP

34

Case No.

CLASS ACTION COMPLAINT

(f)    Plaintiff suffered increased anxiety and fear about the future harms to the health and well-being of her co-workers, friends, and family members who were in contact with Plaintiff.

93.    Those harms are different from the types of harms suffered by members of the general public who did not work, or have direct contact with employees who worked, at the Hanford Plant where multiple employees contracted COVID-19.

94.    Defendant's failure to comply with minimum health and safety standards and regulations at the Hanford Plant, and its other wanton and reckless misconduct, has caused, and is reasonably certain to cause, community spread of COVID-19 infection.  Such community spread has not been, and will not be, limited to the physical location of the Hanford Plant or to the customers or employees of the Hanford Plant, because infected workers have gone home and will go home to interact with their family members, co-residents, neighbors, and others with whom they must necessarily interact as they undertake essential daily activities, such as shopping, doctor's visits, and childcare.

95.    The community spread because of Defendant's conduct has resulted in increased COVID-19 disease and will continue to result in increased disease. Defendant's conduct has unreasonably interfered with the common public right to public health and safety and is reasonably certain to cause further spread of COVID-19 infection and the reasonable and severe fear of further spread of COVID-19 to Plaintiff, the Class, and other members of the community.

96.    If prompt and immediate injunctive relief is not granted, Plaintiff and the Class face a significant risk of irreparable harm in the form of physical and emotional injuries and death from Defendant's continuing creation and assistance in the creation of a public nuisance. Workers employed at the Hanford Plant, and their family members and friends, are particularly vulnerable to severe bodily injury or death because of their workplace exposures. With reports of varying strains of the virus, Plaintiff may also be exposed to future COVID-19 infection. Such injuries cannot be adequately compensated through an award of damages or otherwise remedied at law.

HAEGGQUIST & ECK, LLP

1    97.    Administrative and governmental remedies have proven inadequate to protect

2    Plaintiff from the harms alleged in this Complaint and remedying the wrongful conduct by

3    Defendant.  OSHA and Cal/OSHA, the principal government agencies tasked with ensuring

4    workplace safety, have deprioritized inspections and enforcement at non-medical workplaces.

5    The CDC, while able to issue recommendations, does not have or exercise independent

6    enforcement authority against businesses that fail to follow those recommendations.  Based on

7    information and belief, workers have submitted complaints to public authorities about the public

8    nuisance and public health and safety dangers resulting from Defendant's acts and omissions as

9    alleged herein but have obtained no relief.

10    98.    Indeed, despite the CDC having issued guidance that there is a significantly

11    heighted risk of COVID-19 exposure in meat processing facilities, and numerous news outlets

12    publicly reporting the outbreak at the Hanford Plant, there is no evidence that either OSHA or

13    Cal/OSHA have opened an investigation into Defendant's facility.

14    99.    The risk of injury faced by Plaintiff, the Class, and the immediate community,

15    outweighs the cost of the reasonable measures, including Plaintiff's proposed injunction.

16    100.    Defendant is a substantial contributor to the public nuisance alleged herein. Its

17    past and ongoing conduct is a direct and proximate cause of Plaintiff's injuries and threatened

18    injuries.

19    101.    Defendant knows, and should have known, that its conduct as alleged in this

20    Complaint would be the direct and proximate cause of the injuries and threatened injuries to

21    Plaintiff and the Class.  Its conduct was committed knowingly and willfully.

22    102.    Defendant's conduct alleged in this Complaint constitutes a substantial and

23    unreasonable interference with and obstruction of public rights and property, including the

24    public rights to healthy, safety, and welfare of Plaintiff, and those who come into contact with

25    her, whose safety and lives are at risk because of Defendant's actions and omissions as alleged

26    herein.

27

28

HAEGGQUIST & ECK, LLP

36

Case No.

CLASS ACTION COMPLAINT

103.    In addition to declaratory relief, injunctive relief, and damages as alleged herein, Plaintiff is entitled to interest, penalties, attorneys' fees and expenses pursuant to Code of Civil Procedure §1021.5, and costs of suit.

**COUNT II**
**Negligence**
**(On Behalf of Plaintiff and Sub-Class One)**

104.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if set forth in full herein.

105.    As set forth above, Defendant engaged in conduct that was negligent, Plaintiff was harmed, and Defendant's negligence was a substantial factor in causing Plaintiff's harm. Defendant failed to exercise a degree of care that a reasonable person under similar circumstances would employ to protect others from harm.

106.    Numerous laws, regulations, rules, and guidelines imposed upon Defendant a duty to provide a safe and healthy workplace for Plaintiff and the Class, including, without limitation:

(a)    The General Duty Clause, Section 5(a)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. §654(a)(1);

(b)    OSHA's Personal Protective Equipment ("PPE") standards, 29 C.F.R. §1910, Subpart I;

(c)    California Labor Code §6400(a);

(d)    California Labor Code §6404;

(e)    Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19) from CDC;

(f)    Coronavirus Disease 2019 (COVID-19), Meat and Poultry Processing Workers and Employers, Interim Guidance from CDC and OSHA;

(g)    County, state, and local health orders; and

(h)    Defendant's Employee Handbook, including its policies relating to the health and safety of its employees;

HAEGGQUIST & ECK, LLP

107.    Defendant breached its duty to Plaintiff and the Class by:

(a)    Actively concealing, or otherwise knowingly failing to timely notify Plaintiff and the Class, of the existence of active COVID-19 outbreak among its workforce;

(b)    refusing to timely send home employees with COVID-19 symptoms;

(c)    Knowingly forcing Plaintiff and the Class to work in close proximity to persons infected with COVID-19;

(d)    pressuring employees who call in sick with COVID-19 symptoms to report to work with threats of job termination/abandonment;

(e)    instituting a No-Fault Attendance Policy which threatens employees with discipline up to and including termination for absences, even if the absences for being sick or on protected leave;

(f)    instituting a Bonus Appreciation Policy for workers to lose bonuses for missing any work, even if it's because they are sick or on protected leave;

(g)    instituting an Incentive Pay Policy for workers to lose incentive pay for missing any work, even if it's because they are sick or on protected leave;

(h)    refusing to implement adequate engineering controls to prevent the spread of SARS-CoV-2;

(i)    failing to adequately educate or train supervisors and workers regarding COVID-19 issues;

(j)    allowing and pressuring workers exposed to SARS-CoV-2 and who test positive for COVID-19 to return to work without proper quarantining, screening, monitoring, and/or other protective measures;

(k)    failing to adequately trace COVID-19 cases; and

(l)    generally prioritizing factory production over Plaintiff's and the Class's health and safety.

108.    Defendant's conduct harmed Plaintiff by causing her to suffer severe anxiety and emotional distress because of the fear of contracting COVID-19 and suffering from its health

HAEGGQUIST & ECK, LLP

1    effects. She relatedly feared for the safety of those persons close to her. Plaintiff's fear stemmed

2    from knowledge, corroborated by reliable objective evidence, that it was more likely than not

3    that the feared COVID-19 would develop in the future due to Defendant's conduct.

4        109.    Plaintiff will be able to prove, based on reliable medical and scientific opinion,

5    that Defendant's conduct made it more likely than not that Plaintiff would in fact contract

6    COVID-19 due to Defendant's conduct. Indeed, she in fact contracted COVID-19. Plaintiff

7    continues to suffer emotional distress and fear regarding her health and wellbeing and her future

8    health status due to the potential effects of COVID-19, including reports of organ damage and

9    the possibility of death, among other long-term health complications. Plaintiff further suffers

10    from anxiety and stress about future health problems due to COVID-19 because of Defendant's

11    conduct, which are reasonable fears that will be supported by medical and scientific opinions at

12    trial. Plaintiff's fear was and is serious, genuine, and reasonable.

13        110.    Defendant acted maliciously, fraudulently, and/or oppressively because

14    Defendant had increased knowledge regarding the danger of COVID-19 and negligently allowed

15    Plaintiff to be at risk because it would have hurt the company's bottom line to adequately

16    mitigate the risks.

17        111.    Contracting COVID-19 was never contemplated, expressly or impliedly, as

18    within the scope of the on-the-job risks to which Plaintiff agreed or would be subjected while

19    working for Defendant. At all relevant times, Plaintiff and the other employees working at the

20    Hanford Plant were performing their normal non-exceptional job duties. Stated another way,

21    before and during the COVID-19 pandemic, Plaintiff was not required to perform any job duties

22    outside the scope of her normal job requirements that would have increased the risk of

23    contracting COVID-19. Indeed, SARS-CoV-2, and its related COVID-19 disease, are not

24    commonly regarded as natural to, inhering in, and/or incidental and concomitant of, the work in

25    question at Central Valley Meat. In other words, SARS-CoV-2 was not and is not confined to

26    Defendant's workplace, but rather, a worldwide pandemic.

27

28

HAEGGQUIST & ECK, LLP

1    112.    Defendant's misconduct alleged herein exceeded the normal risks of the

2    employment relationship and contravened fundamental public policy. Plaintiff's exposure to

3    SARS-CoV-2 was because Defendant's abnormal conduct went beyond risks inherent in the job.

4    Defendant affirmatively and knowingly imperiled Plaintiff, which is distinct from exposure to

5    the natural risks incident to the job.  In short, Plaintiff's COVID-19 infection did not arise out

6    of the normal expectations of the job and is not a part of the compensation bargain.

7    113.    As a proximate result of Defendant's unlawful actions and omissions, Plaintiff

8    has been damaged in an amount according to proof at trial.

9    114.    In addition to declaratory relief, injunctive relief, and damages as alleged herein,

10   Plaintiff is entitled to interest, penalties, attorneys' fees and expenses pursuant to Code of Civil

11   Procedure §1021.5, and costs of suit.

### COUNT III
### Wanton and Reckless Misconduct
### (On Behalf of Plaintiff and Sub-Class One)

14   115.    Plaintiff hereby realleges and incorporates by reference the allegations contained

15   in the paragraphs above, as if set forth in full herein.

16   116.    California recognizes a "tort having some of the characteristics of both

17   negligence and willfulness," most accurately "designated as wanton and reckless misconduct."

18   *Donnelly v. Southern Pacific Co.*, 18 Cal. 2d 863, 869 (1941); *Levinson v. Harrison*, 198 Cal.

19   App. 2d 274, 279 (1961) (same). The tort goes by various other names, including "willful

20   negligence," "wanton and willful negligence," "wanton and willful misconduct," "reckless

21   disregard of the safety of another," and even "gross negligence." *Id*.  The tort occurs "when a

22   person with no intent to cause harm intentionally performs an act so unreasonable and dangerous

23   that he knows, or should know, it is highly probable that harm will result." *Id*.

24   117.    The tort "involves no intention, as does willful misconduct, to do harm, and it

25   differs from negligence in that it does involve an intention to perform an act that the actor knows,

26   or should know, will very probably cause harm." *Donnelly*, 18 Cal. 2d at 869.  The tort "justifies

HAEGGQUIST & ECK, LLP

Case No.

CLASS ACTION COMPLAINT

an award of punitive damages, and contributory negligence by the plaintiff is not a defense." *Id.* at 869-870.

118.    As detailed with specificity in the Complaint above, Defendant had (i) knowledge of the peril from COVID-19 to be apprehended; (ii) actual and constructive knowledge that injury was a probable result of the danger; and (iii) consciously failed to act to avoid the peril, and actually engaged in deliberate misconduct it knew, or should have known, would increase the risk of peril.

119.    Plaintiff will be able to prove, based on reliable medical and scientific opinion, that Defendant's conduct made it more likely than not that Plaintiff would in fact contract COVID-19 due to Defendant's conduct. Indeed, she in fact contracted COVID-19.    Plaintiff continues to suffer emotional distress and fear regarding her health and wellbeing and her future health status due to the potential effects of COVID-19, including reports of organ damage and the possibility of death, among other long-term health complications.    Plaintiff further suffers from anxiety and stress about future health problems due to COVID-19 because of Defendant's conduct, which are reasonable fears that will be supported by medical and scientific opinions at trial.    Plaintiff's fear was and is serious, genuine, and reasonable.

120.    Defendant acted maliciously, fraudulently, and/or oppressively because Defendant had increased knowledge regarding the danger of COVID-19 and negligently allowed Plaintiff to be at risk because it would have hurt the company's bottom line to adequately mitigate the risks.

121.    Contracting COVID-19 was never contemplated, expressly or impliedly, as within the scope of the on-the-job risks to which Plaintiff agreed or would be subjected while working for Defendant. At all relevant times, Plaintiff and the other employees working at the Hanford Plant were performing their normal non-exceptional job duties.    Stated another way, before and during the COVID-19 pandemic, Plaintiff was not required to perform any job duties outside the scope of her normal job requirements that would have increased the risk of contracting COVID-19.    Indeed, SARS-CoV-2, and its related COVID-19 disease, are not

1  commonly regarded as natural to, inhering in, and/or incidental and concomitant of, the work in

2  question at Central Valley Meat.  In other words, SARS-CoV-2 was not and is not confined to

3  Defendant's workplace, but rather, a worldwide pandemic.

4      122.    Defendant's misconduct alleged herein exceeded the normal risks of the

5  employment relationship and contravened fundamental public policy. Plaintiff's exposure to

6  SARS-CoV-2 was because Defendant's abnormal conduct went beyond risks inherent in the job.

7  Defendant affirmatively and knowingly imperiled Plaintiff, which is distinct from exposure to

8  the natural risks incident to the job.  In short, Plaintiff's COVID-19 infection did not arise out

9  of the normal expectations of the job and is not a part of the compensation bargain.

10      123.    Defendant's conduct harmed Plaintiff by causing her to suffer severe anxiety and

11  emotional distress because of the fear of contracting COVID-19 and suffering from its health

12  effects. She relatedly feared for the safety of those persons close to her.  Plaintiff's fear stemmed

13  from knowledge, corroborated by reliable objective evidence, that it was more likely than not

14  that the feared COVID-19 would develop in the future due to Defendant's conduct.

15      124.    As a proximate result of Defendant's unlawful actions and omissions, Plaintiff

16  has been damaged in an amount according to proof at trial.

17      125.    In addition to declaratory relief, injunctive relief, and damages as alleged herein,

18  Plaintiff is entitled to interest, penalties, attorneys' fees and expenses pursuant to Code of Civil

19  Procedure §1021.5, and costs of suit.

**COUNT IV**
**Violation of the Confidentiality of Medical Information Act ("CMIA"),**
**California Civil Code §§56.20, *et seq*.**
**(On Behalf of Plaintiff and Sub-Class Four)**

23      126.    Plaintiff hereby realleges and incorporates by reference the allegations contained

24  in the paragraphs above, as if set forth in full herein.

25      127.    Plaintiff is a "patient" within the meaning of the CMIA because she is a "natural

26  person" who "received healthcare services from a provider of health care and to whom medical

27  information pertains."   Civil Code §56.05(k). Specifically, Plaintiff received, among other

28  treatment and evaluation, a viral test for COVID-19 by a provider of health care as defined in

HAEGGQUIST & ECK, LLP

Civil Code §56.05(m) and the COVID-19 diagnosis and other identifying information was provided to Defendant.    Plaintiff's name, COVID-19 diagnosis, and other identifiable information is "medical information" within the meaning of CMIA. Civil Code §56.05(j).

128.    Generally, any person or entity who wishes to obtain medical information, with limited exceptions not applicable here, must obtain a valid authorization for the release of this information that is compliant with Civil Code §56.11(a)-(i). *See, generally*, Civil Code §56.11. A recipient of medical information pursuant to this authorization may not further disclose that medical information except in accordance with a new authorization that meets the requirements of Civil Code §56.11.  Civil Code §56.13.

129.    Furthermore, California law obligates an employer who receives medical information "to ensure the confidentiality and protection from unauthorized use and disclosure of that information." Civil Code §56.20(a).  These procedures may include, but are not limited to, "instruction regarding confidentiality of employees and agents handling files containing medical information, and security systems restricting access to files containing medical information." *Id.* Similarly, to disclose medical information, an employer must first obtain an authorization complaint with Civil Code §56.21(a)-(i).

130.    Defendant obtained Plaintiff's and numerous other employees' medical information, without a compliant authorization.  Defendant failed to provide proper instructions to employees and agents handling files containing medical information and failed to implement adequate security systems restricting access to files containing medical information.  Defendant failed to ensure the confidentiality and protection of the medical information from unauthorized use and/or disclosure.  Defendant in fact disclosed Plaintiff's and other employee's confidential medical information without their consent or a proper authorization.

131.    Plaintiff and other employees were harmed by Defendant's failure to comply with the CMIA and, therefore, bring this action against Defendant for improperly receiving and negligently releasing confidential medical information to obtain actual damages or, at a minimum, nominal damages of one thousand dollars ($1,000.00).  Civil Code §56.36(b). To

HAEGGQUIST & ECK, LLP

1    recover nominal damages, it is "not necessary that the plaintiff suffered or was threatened with

2    actual damages." Civil Code §56.36(b)(1).

3        132.    Plaintiff further brings this action to recover compensatory damages, punitive

4    damages not to exceed three thousand dollars ($3,000), attorneys' fees not to exceed one

5    thousand dollars, and the costs of litigation pursuant to Civil Code §§56.35, 56.36, and any other

6    applicable law.

**COUNT V**
**Disability Discrimination and Failure to Accommodate**
**In Violation of the Fair Employment and Housing Act Government Code §12940, *et seq.***
**(On Behalf of Plaintiff and Sub-Class Three)**

10      133.    Plaintiff hereby realleges and incorporates by reference the allegations contained

11   in the paragraphs above, as if set forth in full herein.

12      134.    The FEHA prohibits employment discrimination on the basis of "physical

13   disability, mental disability [and] medical condition …." Gov. Code §12940(a).  The FEHA's

14   protections are independent of those the ADA provides.  Gov. Code §12926.1(a); *see also* Gov.

15   Code §12926.1(d)(1); 2 C.C.R. §11065(d)(8).  What constitutes a disability under FEHA is

16   broadly defined, to include, among other things, any condition that affects the immunological

17   system or limits a major life activity. 2 C.C.R. §11065(d).  The FEHA prohibits disability

18   discrimination resulting from a facially neutral employment practice or policy that has a

19   disproportionate effect on disabled employees (disparate impact).  *Avila v. Continental Airlines,*

20   *Inc.,* 165 Cal. App. 4th 1237, 1239 (2008).  The FEHA also makes it unlawful for an employer

21   to "fail to make reasonable accommodations for the known physical or mental disability of an

22   applicant or employee."  Gov. Code §12940(m)(1).

23      135.    At relevant times, Plaintiff has had a disability because of her COVID-19 disease,

24   and Defendant knew and perceived Plaintiff as having a disability.  Because of Plaintiff's

25   disability, she needed a temporary leave of absence as a reasonable accommodation.

26   Unfortunately, Defendant instituted a No-Fault Attendance Policy which had an unlawful

27   discriminatory impact on Plaintiff by giving employees points toward discipline, up to and

28   including termination, for absences irrespective of the reason for the absence, including as an

HAEGGQUIST & ECK, LLP

44                                    Case No.

1    accommodation for a disability.  No fault attendance policies, such as Defendant's, violate the

2    FEHA because such a policy does not consider such absences as a protected accommodation.

3    136.    In addition, Defendant's No-Fault Attendance Policy, Bonus Appreciation

4    Policy, and Incentive Pay Policy are coercive and act to "chill" employees' willingness to

5    exercise their statutory rights for leave as an accommodation because if they do so, they are

6    penalized with points toward discipline and/or lose incentive pay for doing so.

7    137.    Plaintiff was not only discouraged from using leave as a reasonable

8    accommodation for her disability because of Defendant's No-Fault Attendance Policy, Bonus

9    Appreciation Policy, and Incentive Pay Policy, but her supervisor also discouraged Plaintiff

10   from taking accommodated leave by threatening her that Defendant would not hold Plaintiff's

11   job open if Plaintiff takes leave.  Plaintiff is also aware of management threatening and/or

12   otherwise similarly discouraging other employees from taking accommodated leave with threats

13   of job loss.

14   138.    As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered,

15   and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of

16   employment, all in an amount to be determined according to proof at the time of trial, plus

17   interest thereon.

18   139.    As a further proximate result of Defendant's wrongful conduct, Plaintiff has

19   suffered, and continues to suffer, anxiety, humiliation, embarrassment, emotional distress, and

20   mental anguish, all in an amount to be determined according to proof at the time of trial.

21   140.    In performing the acts alleged herein, Defendant acted with oppression, fraud,

22   malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled

23   to punitive damages against Defendant in an amount appropriate to punish and make an example

24   of Defendant.

25   141.    Plaintiff is also entitled to costs and reasonable attorneys' fees pursuant to Gov.

26   Code §12965(b), because of Defendant's wrongful conduct

27

28

HAEGGQUIST & ECK, LLP

1
2
3

**COUNT VI**
**Interference with the Right to Medical Leave**
**In Violation of the Family Medical Leave Act, 29 U.S.C. §2601, *et seq.***
**(On Behalf of Plaintiff and Sub-Class Two)**

4
5

142.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if set forth in full herein.

6
7
8
9

143.    At all times relevant hereto, Defendant was an "employer" subject to the FMLA because Defendant was engaged in commerce, or in an industry affecting commerce, and employed 50 or more employees for each working day of the 20 workweeks just prior to Plaintiff taking FMLA leave. 29 U.S.C. §2611(4)(A)(i).

10
11
12
13

144.    At all times relevant hereto, Plaintiff was an "eligible employee" covered by the FMLA because Plaintiff was employed by Defendant for at least 1,250 hours during the 12-month period just prior to taking FMLA leave and worked at a worksite at which Defendant employed more than 50 employees. 29 U.S.C. §2611(2).

14
15
16
17
18
19

145.    As an eligible employee, Plaintiff was entitled to 12 workweeks of leave to care for a serious health condition which made her unable to perform the functions of her job. 29 U.S.C. §2612(a)(1)(D). The FMLA defines a "serious health condition" to include an "illness … or physical … condition … that involves … (B) continuing treatment by a health care provider." 29 U.S.C. §2611(11). Plaintiff has suffered from an illness and condition for which she has been receiving continuing treatment by a healthcare provider.

20
21
22
23
24
25
26
27
28

146.    The FMLA prohibits employers from "interfering with, restraining, or denying" an employee's exercise of FMLA rights. 29 U.S.C. §2615(a)(1); 29 C.F.R. §825.220(a)(1). The intention and motivation of the employer are irrelevant when deciding an FMLA interference case. It also prohibits employers from "discriminating or retaliating against an employee … for having exercised or attempted to exercise FMLA rights." 29 C.F.R. §825.220(c). Employers, therefore, cannot consider "FMLA leave as a negative factor in employment actions" and must provide an employee who takes FMLA leave with the same benefits that "an employee on leave without pay would otherwise be entitled to [receive]." *Id.; Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003) ("[W]here an employee is subjected to negative consequences simply

46

because he has used FMLA leave, the employer has interfered with the employee's FMLA leave rights"). Stated another way, if "an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which he is entitled." *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 447 (6th Cir. 2007).

147. Certain types of incentive pay/bonuses are covered under the broad scope of the FMLA. Production bonuses that require employees to accomplish a specific production goal may, in certain circumstances, be reduced according to time taken under the FMLA; however, "bonuses which merely reward for the absence of occurrences cannot." *Caldwell v. Bldg. Plastics, Inc.,* 2009 U.S. Dist. LEXIS 76168, *14-15 (W.D. TN, Aug. 25, 2009); *Sommer v. The Vanguard Grp.,* 461 F.3d 397, 401 (3d Cir. 2006) (finding an employer "may not reduce an absence of occurrence bonus paid to an FMLA leave take if the employee was otherwise qualified but-for the taking of the FMLA leave ….") .

148. "Bonuses for perfect attendance … do not require performance by the employee but rather contemplate the absence of occurrences." 2 C.F.R. §825.215(c)(d). In other words, it is unlawful for an employer to cause an employee to suffer a negative consequence of losing incentive or bonus pay for failing to meet a perfect attendance policy where the reason for losing the bonus was for taking time under the FMLA. *See, e.g., Dierlam v. Wesley Jessen Corpl.,* 222 F. Supp. 2d 1052, 1056 (2002) (where the Court found a bonus which provided that "if [plaintiff] remained 'actively employed' by [defendant] . . . , she was entitled to a one-time bonus . . ." was a type of attendance bonus and could not be prorated for the time in which plaintiff was absent due to her FMLA leave); *Applegate v. Kiawah Dev. Partners, Inc.,* 2013 U.S. Dist. LEXIS 89117, *33-34 ; *Caldwell,* 2009 U.S. Dist. LEXIS 76168 at *15 (finding that where a bonus depended on two things, employee performance and company profitability, and did not require the employees to accomplish any specific goal in order to be entitled to them, that "[t]his [was] not the type of bonus that may be reduced by the taking of FMLA leave.").

HAEGGQUIST & ECK, LLP

149.    Here, Defendant instituted a "Bonus Appreciation Policy" and an "Attendance Incentive Policy" which cause employees who do not work all hours in a scheduled week to lose incentive pay. Employees suffer a negative consequence for failing to have perfect attendance, even if the sole reason for the failure to perfect attendance is for taking FMLA-protected leave. The incentive pay is not contingent on employees meeting any production goals or quality standards; rather, it merely rewards for the absence of an occurrence (*e.g.*, not being absent for any hours).

150.    Under its policies, Defendant took an adverse employment action and denied Plaintiff a benefit for which she was entitled, namely, an incentive payment and bonus, solely because she took FMLA-protected leave.  But for taking FMLA-protected leave, Plaintiff would have achieved perfect attendance and been eligible for the inventive pay and bonus.  Stated another way, Plaintiff suffered a negative consequence of losing incentive pay and bonuses for failing to meet Defendant's perfect attendance policies because she was forced to take time under the FMLA.   As such, Defendant unlawfully interfered with Plaintiff's FMLA rights.

151.    In addition, "interference," by an employer with FMLA rights includes discouraging employees from using FMLA leave.  29 C.F.R. §825.220(b).  Here, through its Incentive Pay Policy, Defendant discourages employees from using FMLA leave for fear of losing incentive pay.  Plaintiff's supervisor also discouraged Plaintiff from taking FMLA leave by threatening her that Defendant would not hold Plaintiff's job open if Plaintiff takes leave. Plaintiff is also aware of management threatening and/or otherwise similarly discouraging other employees from taking protected leave with threats of job loss.  As such, Defendant unlawfully interfered with Plaintiff's and other employees' FMLA rights.

152.    In addition, "FMLA leave [cannot] be counted under no-fault attendance policies," meaning employees cannot accrue points for taking FMLA leave under a no-fault attendance policy.  29 C.F.R. §825.220(c). Based on information and belief, Defendant violated the FMLA through its No-Fault Attendance Policy, whereby employees accrue points toward discipline, up to and including termination, for taking leave, including for taking protected

HAEGGQUIST & ECK, LLP

FMLA leave. As such, Defendant unlawfully interfered with Plaintiff's and other employees' FMLA rights.

153.    As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial, plus interest thereon.

154.    As a result of Defendant's willful misconduct, Plaintiff is also entitled to liquidated damages equal to the sum of her substantial losses in earnings, earning capacity, and other benefits of employment, plus interest thereon, pursuant to 29 U.S.C. §2617(a)(1)(A)(iii).

155.    As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

156.    In performing the acts alleged herein, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

157.    Finally, as a result of Defendant's wrongful conduct, Plaintiff is entitled to attorneys' fees, expert witness fees, and other costs of the action pursuant to 29 U.S.C. §2617(a)(3).

**COUNT VII**
**Interference with Right to Take Medical Leave**
**In Violation of the California Family Rights Act, Government Code §12945.2, *et seq.***
**(On Behalf of Plaintiff and Sub-Class Two)**

158.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if set forth in full herein.

159.    At all times relevant hereto, Defendant was an "employer" subject to the CFRA because Defendant was engaged in commerce, or in an industry affecting commerce, and employed 50 or more employees. Government Code §12945.2(c)(2)(A).

Case No.
CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

HAEGGQUIST & ECK, LLP

160.    At all times relevant hereto, Plaintiff was an eligible employee covered by the CFRA because Plaintiff was employed by Defendant for at least 1,250 hours during the 12-month period just prior to taking leave and worked at a worksite at which Defendant employed more than 50 employees. Government Code §12945.2 (a).

161.    As an eligible employee, Plaintiff was entitled to 12 workweeks of leave to care for a serious health condition. The CFRA permits leave because of the employee's "own serious health condition that makes the employee unable to perform the functions of the position of that employee ...." Government Code §12945.2(c)(3)(C).

162.    Government Code §12945.2(l) provides that "[i]t shall be an unlawful employment practice for an employer to … discriminate against, any individual because of … [a]n individual's exercise of the right to family care and medical leave …." Government Code §12945.2(t) further provides that "[i]t shall be an unlawful employment practice for an employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this section."

163.    "The antidiscrimination provision prevents employers from counting CFRA leave as absences under a no-fault attendance policy." *Avila v. Continental Airlines, Inc.*, 165 Cal. App. 4th 1237, 1254 (2008) (citing 2 CCR §11096, incorporating, *inter alia*, 29 C.F.R. §825.220). Based on information and belief, Defendant violated the CFRA through its No-Fault Attendance Policy, whereby employees accrue points toward discipline, up to and including termination, for taking leave, including for taking protected CFRA leave.   As such, Defendant unlawfully interfered with Plaintiff's and other employees' CFRA rights

164.    In addition, Defendant instituted a Bonus Appreciation Policy and an Incentive Pay Policy which cause employees who do not work all hours in a scheduled week to lose incentive pay. Employees suffer a negative consequence for failing to have perfect attendance, even if the sole reason for the failure to perfect attendance is for taking CFRA-protected leave. The incentive pay and bonus is not contingent on employees meeting any production goals or

1   quality standards; rather, it merely rewards for the absence of an occurrence (*e.g.*, not being

2   absent for any hours).

3        165.    Under its policy, Defendant took an adverse employment action and denied

4   Plaintiff a benefit for which she was entitled, namely, an incentive payment and bonus, solely

5   because she took CFRA-protected leave.  But for taking CFRA-protected leave, Plaintiff would

6   have achieved perfect attendance and been eligible for the incentive pay and bonus.  Stated

7   another way, Plaintiff suffered a negative consequence of losing incentive pay and bonuses for

8   failing to meet Defendant's perfect attendance policy because she was forced to take time under

9   the CFRA.  As such, Defendant unlawfully interfered with Plaintiff's CFRA rights.

10       166.    Moreover, Defendant interfered by Plaintiff's CFRA rights by discouraging her

11  from using CFRA leave.  Through its Bonus Appreciation Policy and Incentive Pay Policy,

12  Defendant discourages employees from using CFRA leave for fear of losing incentive pay and

13  bonuses.  Plaintiff's supervisor also discouraged Plaintiff from taking CFRA leave by

14  threatening her that Defendant would not hold Plaintiff's job open if Plaintiff takes leave.

15  Plaintiff is also aware of management threatening and/or otherwise similarly discouraging other

16  employees from taking protected leave with threats of job loss.  As such, Defendant unlawfully

17  interfered with Plaintiff's and other employees' CFRA rights.

18       167.    As a proximate result of Defendant's conduct, Plaintiff has suffered, and

19  continues to suffer, losses in earnings and benefits in an amount to be determined according to

20  proof at the time of trial.

21       168.    As a further proximate result of Defendant's conduct, Plaintiff has suffered, and

22  continues to suffer, anxiety, humiliation, embarrassment, emotional distress, and mental

23  anguish, all in an amount to be determined according to proof at the time of trial.

24       169.    In performing the acts alleged herein, Defendant acted with oppression, fraud,

25  malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled

26  to punitive damages against Defendant in an amount appropriate to make an example of

27  Defendant.

28

HAEGGQUIST & ECK, LLP

51

Case No.

CLASS ACTION COMPLAINT

1    170.    Plaintiff is also entitled to costs and reasonable attorneys' fees pursuant to

2    Government Code §12965(b), because of Defendant's wrongful conduct.

3                                   **COUNT VIII**
     **Breach of the Implied Covenant of Good Faith and Fair Dealing**
4                          **(On Behalf of Plaintiff and the Class)**

5    171.    Plaintiff hereby realleges and incorporates by reference the allegations contained

6    in the paragraphs above, as if set forth in full herein.

7    172.    "Every contract contains an implied covenant of good faith and fair dealing

8    providing that no party to the contract will do anything that would deprive another party of the

9    benefits of the contract." *Digerati Holdings, LLC v. Young Money Entertainment, LLC*, 194 Cal.

10   App. 4th 873, 885 (2011). "'The covenant of good faith finds particular application in situations

11   where one party is invested with a discretionary power affecting the rights of another. Such

12   power must be exercised in good faith.'" *Hicks v. E.T. Legg & Associates*, 89 Cal. App. 4th 496,

13   508 (2001). The covenant "requires the party holding such power to exercise it 'for any purpose

14   within the reasonable contemplation of the parties at the time of formation--to capture

15   opportunities that were preserved upon entering the contract, interpreted objectively.'" *Id.*

16   173.    Plaintiff and Defendant entered an employment contract, whereby Plaintiff and

17   Defendant agreed that in exchange for Plaintiff's services, Defendant would pay Plaintiff an

18   hourly wage.  Defendant's Employee Handbook sets forth the "terms and conditions" of the

19   employment agreement, including, without limitation:

20          (a)    a prohibition of discrimination based on, *inter alia*, physical or mental

21   disability and/or medical condition;

22          (b)    a prohibition of failing to reasonably accommodate qualified individuals

23   with disabilities where the accommodation does not pose an undue hardship;

24          (c)    maintaining confidentiality of employee information;

25          (d)    a prohibition of discrimination, retaliation, and/or interference under the

26   FMLA and CFRA; and

27

28

HAEGGQUIST & ECK, LLP

(e)    ensuring the health, safety, and well-being of its employees, and of the people living and working in communities near its facilities.

174.    Plaintiff did all, or substantially all the significant things that the contract required her to do, including performing her essential work duties.  All conditions required for Defendant to perform under the terms and conditions of the parties' employment agreement had occurred. Defendant breached each of the above-mentioned terms and conditions of the employment agreement and, thereby unfairly interfered with Plaintiff's right to receive benefits of the contract.

175.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class were harmed in an amount to be proven at the time of trial.

**COUNT IX**
**Unfair Competition Law ("UCL")**
**In Violation of California Business & Professions Code §17200, *et seq.***
**(On Behalf of Plaintiff and the Class)**

176.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if set forth in full herein.

177.    Defendant's acts and omissions alleged in this Complaint constitute unfair and unlawful business practices under California Business and Professions Code §17200, *et seq.*

178.    Defendant has engaged in the following unlawful activities:

(a)    Causing a public nuisance in violation of, *inter alia*, Civil Code §§3479, *et seq.*;

(b)    Negligence;

(c)    Wanton and Reckless Misconduct;

(d)    Violations of the ADA, 42 U.S.C. §12112, *et seq.*;

(e)    Violations of the ADA, 42 U.S.C. §12101, *et seq.*;

(f)    Violations of the FEHA, Gov. Code §12940, *et seq.*;

(g)    Violations of the FMLA, 29 U.S.C. §2601, *et seq.*;

(h)    Violations of the CFRA, Gov. Code §12945.2, *et seq.*;

(i)    Violations of the CMIA, Civil Code §56.20, *et seq.*;

53

Case No.

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

1          (j)      Violations of the CCPA, Civil Code §1798.100, *et seq*.; and

2          (k)      Violations of the general duty clauses to make the workplace safe and

3    health in violation of, *inter alia*, 29 U.S.C. §654, Labor Code §§6400, 6403, and 6404, OSHA

4    and CDC guidance, and health officer orders.

5          179.    Defendant's acts and omissions constitute business practices in that Defendant

6    has engaged in them repeatedly over a significant period and in a systematic manner, to the

7    detriment of Plaintiff and to Defendant's economic benefit.  Defendant's actions also constitute

8    unfair business practices because it has caused Plaintiff and employees of the Hanford Plant, as

9    well as their family and community members, to contract COVID-19 infections that could have

10   been avoided and/or risk of infection substantially reduced through reasonably safe practices.

11         180.    Defendant's acts and omissions have caused economic injury to Plaintiff causing

12   her to lose money or property, including but not limited to lost wages, medical expenses, cost of

13   health and care supplies and PPE.

14         181.    As a result of Defendant's unfair and unlawful practices, Defendant has gained

15   an unfair advantage over other meat processing facilities that adequately protected the health

16   and safety of their employees, customers, and the public, and have reaped and continue to reap

17   unfair and illegal profits at the expense of Plaintiff and members of the public.  Defendant should

18   be made to disgorge its ill-gotten gains and to restore them to Plaintiff.

19         182.    The unlawful and unfair conduct alleged herein is continuing, and there is no

20   indication that Defendant will refrain from such activity in the future. Plaintiff believes and

21   alleges that if Defendant is not enjoined from the conduct set forth in this Complaint, it will

22   continue to violate the laws at issue in this Complaint. Plaintiff further requests that the Court

23   issue a preliminary and permanent injunction. Defendant should be enjoined and cease and desist

24   from engaging in the practices described herein for the maximum time permitted pursuant to

25   California Business & Professions Code §17208, including any tolling.

26         183.    Defendant's unfair and unlawful business practices entitle Plaintiff to seek

27   preliminary and permanent injunctive relief, restitution, disgorgement of profits, interest,

28

HAEGGQUIST & ECK, LLP

54

Case No.

penalties, attorneys' fees and expenses pursuant to Code of Civil Procedure §1021.5, and costs of suit.

**COUNT X**
**Declaratory Judgment**
**28 U.S.C. §2201**
**(On Behalf of Plaintiff and the Class)**

184.    Plaintiff hereby realleges and incorporates by reference the allegations contained in the paragraphs above, as if set forth in full herein.

185.    An actual controversy has arisen and now exists between the parties relating to the legal rights and duties of the parties as set forth in this Complaint, for which Plaintiff desires a declaration of rights and other relief available pursuant to 28 U.S.C. §2201.

186.    A declaratory judgment is necessary and proper in that Plaintiff contends that Defendant has committed and continues to commit the violations set forth above and Defendant, on information and belief, will deny that they have done so and/or that they will continue to do so.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, individually and on behalf of all other persons similarly situated, respectfully prays for relief against Defendant and DOES 1 through 50, inclusive, and each of them, as follows:

A.    For preliminary and permanent injunctive relief enjoining Defendant from continuing to engage in, and from refraining from engaging in, the wrongful acts, omissions, and practices alleged herein whose commission and omission constitute a public nuisance, unfair business practice, and/or violation of law;

B.    For a declaration that Defendant has committed a public nuisance and unfair business practices by the wrongful acts, omissions, and practices alleged herein whose commission and omission constitute a public nuisance and unfair practices;

C.    For compensatory damages in an amount to be ascertained at trial;

D.    For restitution of all monies due to Plaintiff and the Class as well as disgorged profits from the unfair and unlawful practices of Defendant;

HAEGGQUIST & ECK, LLP

E.      For penalties as available under the law;

F.      For reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure §1021.5, Civil Code §§56.35 and 56.36, 42 U.S.C. §§12117, 12133, 12205, and 2000e-5(k), 29 U.S.C. §749a(b), and/or any other applicable provisions providing for attorneys' fees and costs;

G.      For interest on unpaid wages at 10% per annum pursuant to California Labor Code § 218.6, California Civil Code §§3287 and 3288, and/or any other applicable provision providing for pre-judgment interest;

H.      For exemplary and punitive damages; and

I.      For such further relief that the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues so triable.

Dated: July 22, 2020                HAEGGQUIST & ECK, LLP
                                    ALREEN HAEGGQUIST
                                    AARON M. OLSEN
                                    IAN PIKE



By: _____
                                    AARON M. OLSEN

                                    225 Broadway, Suite 2050
                                    San Diego, CA  92101
                                    Telephone: 619-342-8000
                                    Facsimile: 619-342-7878

                                    Attorneys for Plaintiff Maria Pilar Ornelas and
                                    the Proposed Class

HAEGGQUIST & ECK, LLP

56

Case No.

CLASS ACTION COMPLAINT

EXHIBIT 1

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

July 22, 2020

Ian Pike
225 Broadway, Suite 2050
San Diego, California 92101

RE:   **Notice to Complainant's Attorney**
      DFEH Matter Number: 202007-10749822
      Right to Sue: Ornelas / Central Valley Meat Co., Inc.

Dear Ian Pike:

Attached is a copy of your complaint of discrimination filed with the Department of Fair
Employment and Housing (DFEH) pursuant to the California Fair Employment and
Housing Act, Government Code section 12900 et seq. Also attached is a copy of your
Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, DFEH will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the DFEH does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,


Department of Fair Employment and Housing

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

July 22, 2020

RE:     **Notice of Filing of Discrimination Complaint**
        DFEH Matter Number: 202007-10749822
        Right to Sue: Ornelas / Central Valley Meat Co., Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit.
This case is not being investigated by DFEH and is being closed immediately. A copy of
the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

No response to DFEH is requested or required.

Sincerely,


Department of Fair Employment and Housing

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

July 22, 2020

Maria Ornelas
1236 Galileo
Hanford, California 93230

RE:    **Notice of Case Closure and Right to Sue**
DFEH Matter Number: 202007-10749822
Right to Sue: Ornelas / Central Valley Meat Co., Inc.

Dear Maria Ornelas,

This letter informs you that the above-referenced complaint was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective July 22, 2020 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,


Department of Fair Employment and Housing

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Maria Ornelas                                          DFEH No. 202007-10749822

Complainant,

vs.

Central Valley Meat Co., Inc.
10431 8 3/4 Avenue
Hanford, California 93230

Respondents

_____

1. Respondent **Central Valley Meat Co., Inc.** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

2. Complainant **Maria Ornelas**, resides in the City of **Hanford** State of **California.**

3. Complainant alleges that on or about **July 22, 2020**, respondent took the following adverse actions:

**Complainant was discriminated against** because of complainant's family care or medical leave (cfra) (employers of 50 or more people), disability (physical or mental) and as a result of the discrimination was denied any employment benefit or privilege, denied family care or medical leave (cfra) (employers of 50 or more people), other.

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a disability-related accommodation, requested or used leave under the california family rights act or fmla (employers of 50 or more people) and as a result was denied any employment benefit or privilege, denied family care or medical leave (cfra) (employers of 50 or more people), other.

**Additional Complaint Details:** _Background Facts_

-1-
*Complaint – DFEH No. 202007-10749822*

Date Filed: July 22, 2020

Maria Pilar Ornelas is an employee of Central Valley Meat Co., Inc. She was exposed to SARS-CoV-2 at Defendant's Hanford facility in April 2020 when she worked near at least one worker who tested positive for COVID-19.  Ms. Ornelas then became very ill on April 23, 2020 and tested positive for COVID-19 on April 28, 2020. Defendant recklessly created a situation where Ms. Ornelas was destined to contract COVID-19 and pass it onto others.

Because of her COVID-19 disease, Ms. Ornelas needed a reasonable accommodation to take several days off work and a CFRA leave of absence. Unfortunately, because of her needed accommodation for her disabling condition and taking protected leave, Defendant denied Ms. Ornelas incentive pay and bonuses she would have otherwise been entitled. Due to the pandemic, Defendant instituted a Bonus Appreciation Policy and an Attendance Incentive Policy which cause employees who do not work all hours in a scheduled week to lose incentive pay and bonuses. Employees suffer a negative consequence for failing to have perfect attendance, even if the sole reason for the failure of perfect attendance is infection with COVID-19 or for otherwise taking CFRA-protected leave. Ms. Ornelas suffered a negative consequence of losing incentive pay and bonuses for failing to meet Defendant's perfect attendance policy because she was forced to take time under the CFRA and because of her disabling condition.

Similarly, Ms. Ornelas was punished by receiving points under Defendant's no-fault attendance policy, where Ms. Ornelas received points toward discipline for being absent, even though the absences were for being out of work due to her disabling condition from COVID-19 and protected CFRA leave.  Ms. Ornelas was also subject to CFRA interference by Defendant's management, who coerced, threatened, and pressured Ms. Ornelas from utilizing protected leave, with threats that the company would not keep her job open if she took time off work.

In response to the coronavirus pandemic, Central Valley Meat instituted two policies whereby employees lost eligibility for incentive pay and bonuses for missing even a single hour of work in a pay period, regardless of the reason for the absence, including COVID-19-related reasons. Specifically, beginning on or around April 26, 2020 through at least May 30, 2020, Central Valley Meat instituted an "Appreciation Bonus" of $100 per week ($200 per pay period) for employees who worked all available hours each week ("Bonus Appreciation Policy").  If employees missed any hours of work, even for being sick or disabled by COVID-19, employees did not receive the bonus.  Similarly, on or around June 2, 2020, Central Valley Meat implemented an "Attendance Incentive" policy, whereby employees lost $2.50 per hour for every scheduled hour not worked, even if the reason for missing work was because the employees were sick or disabled with COVID-19 ("Incentive Pay Policy").  As described below, instituting the Bonus Appreciation Policy and Incentive Pay Policy were not only in direct defiance of governmental guidance due to causing sick employees to report to work during a pandemic, but they also resulted in violations of, inter alia, the ADA, FEHA, FMLA, and CFRA.

Date Filed: July 22, 2020

Throughout her employment with Central Valley Meat, Ms. Ornelas endured long hours working on or around the production line that was fast, unforgiving, and physically and mentally exhausting. Because of the high employee turnover, like other employees, Ms. Ornelas felt the pressure exerted by the company to silently work through hazardous and hard conditions for fear of termination.

On April 18, 2020, a co-worker advised Ms. Ornelas that another worker had tested positive for COVID-19, but that the company was still letting the employee work.  Ms. Ornelas and two other employees told their supervisor, Ms. Hall, what they heard, and Ms. Ornelas further advised Ms. Hall that Ms. Ornelas had come in close contact with an allegedly infected employee.  Ms. Hall advised them that it was just a "rumor," and no precautionary measures were taken to protect Ms. Ornelas or the other employees. Rather, the employee who was the subject of the so-called "rumor" was allowed to continue working without a face covering or precautions. Ms. Ornelas provided Ms. Hall with the names of two other workers believed to have been infected.

Not believing it was just a rumor, Ms. Ornelas asked Ms. Lacey in HR whether any employees had COVID-19.  Even though it is believed several workers had already tested positive for COVID-19, like Ms. Hall, Ms. Lacey also denied any employees were at risk of COVID-19.

Three days later, on April 21, 2020, during her lunch break, Ms. Ornelas learned that a co-worker posted on Facebook that an employee at Central Valley Meats had tested positive for COVID-19.

Suddenly, on April 22, 2020, Central Valley Meats handed Ms. Ornelas a paper saying the company discovered two workers had tested positive the evening prior. Ms. Ornelas immediately felt deceived by Defendant – a company that for the last several weeks had cared more about its bottom line than the risks from COVID-19 and, as described above, created an environment for SARS-CoV-2 to spread like wildfire.

The following day, April 23, 2020, around 11:00 a.m. Ms. Ornelas began feeling very sick while at work.  Ms. Ornelas was struggling to breath and she felt like she was "suffocating."  She had also been experiencing headaches that were so severe that her vision became blurry.  Accordingly, that morning, Ms. Ornelas asked the Lead, Mr. Pina, if she could get a viral test, and after consulting with her supervisor, Ms. Hernandez, Ms. Ornelas was told she would not be provided testing and testing was only being offered for employees chosen by the company.

Central Valley Meat refused to offer Ms. Ornelas a viral test or send her home even though she had direct contact with an employee who tested positive for COVID-19 and she was experiencing COVID-19 symptoms.  The company required Ms. Ornelas to finish her shift until about 4:25 p.m., and by the time Ms. Ornelas arrived home, her face was bright red, she was light-headed and struggling to breath, coughing, and she soon developed a fever of 103.7.  Ms. Ornelas also lost her sense of smell and taste.  Ms. Ornelas again notified Mr. Pino about her condition and it was unlikely she would make it into work the next day because she was so

Date Filed: July 22, 2020

1    sick.  Not once at this time did Mr. Pino advise Ms. Ornelas to self-quarantine or that
     she was not allowed into the workplace.

2    The next morning, on April 24, 2020, Ms. Ornelas communicated with Ms.
3    Hernandez to let her know that she still had a fever and related COVID-19
     symptoms. Ms. Ornelas asked her if the health department could give Ms. Ornelas a
4    test because she understood the company had some of the other employees tested.
5    Ms. Hernandez told Ms. Ornelas to contact HR. Ms. Ornelas tried to contact HR with
     no success. As such, Ms. Ornelas advised Ms. Hernandez that she could not reach
6    HR despite her efforts.  Unbelievably, in response, Ms. Hernandez simply told her it
7    "looks like we will be working tomorrow."

     Ms. Ornelas ultimately reached Ms. Lacey who told her the company would not offer
8    to pay for or arrange viral testing for Ms. Ornelas.  Accordingly, Ms. Ornelas paid
9    $225 out of her pocket to get tested at the Urgent Care in Tulare, California.
     Defendant does not provide Ms. Ornelas with any health insurance, so she had to
10   self-fund for medicine and healthcare supplies.  Ms. Ornelas updated Ms. Lacey that
11   she had gotten tested.  During this process, while Ms. Ornelas was too disabled
     from her sickness to work, the company did not advise Ms. Ornelas to self-
12   quarantine or take any other precautionary measures relating to her.  Nor did the
     company attempt to contact trace,  for example, by asking Ms. Ornelas with whom
13   she had come into close contact.  Likewise, Central Valley Meat did not initiate a
     workers' compensation claim.

14   Ms. Ornelas remained very sick for the next few weeks. In addition to suffering
15   physical illness, Ms. Ornelas suffered from emotional distress and fear that she had
     contracted COVID-19 and its related symptoms and consequences.  She relatedly
16   feared for her safety and for the safety of those persons close to her.  She also
     feared returning to Defendant's unsafe workplace.  Panic attacks are reportedly
17   common among those who are infected and those who fear becoming infected.

     On April 28, 2020, Ms. Ornelas' fears came true.  She received a call from the
18   medical clinic where she had been tested who advised she was positive for COVID-
19   19.  Ms. Ornelas was devasted, not only due to the diagnosis, but because of the
     danger for her 90-year old grandmother, boyfriend, co-workers, and people close to
20   her with whom she had come in contact.  Indeed, Ms. Ornelas infected her boyfriend
     with COVID-19, who is still suffering serious health issues such as damage to his
     nervous system from the disease.

21   Ms. Ornelas continued to suffer emotional distress and fear regarding her then
22   current health and wellbeing and her future status due to the potential effects of
     COVID-19, including reported serious long-term health complications such as lung
23   inflammation, blood clots, intestinal damage, heart inflammation, liver problems,
     neurological malfunction, nervous system damage, acute kidney disease, and death.
24   To date, Ms. Ornelas continues to have severe health problems, including trouble
     breathing, vision-blurring headaches, fevers, and overall fatigue, which have caused
25   her to, among other things, miss work without pay.

26

27                                          -4-
28
     Date Filed: July 22, 2020

Throughout the period of being disabled and absent due to COVID-19, Central Valley Meat's management pressured Ms. Ornelas to return to the workplace despite being sick, with comments such as, "I don't know if I can hold your job open" for being on sick leave.  Due to her disabling condition from COVID-19, Ms. Ornelas was forced to take unpaid CFRA leave causing her to earn points toward discipline under Defendant's No-Fault Attendance Policy and lose incentive pay for missing work under Defendant's Incentive Pay Policy.

¬_Disability Discrimination_

At relevant times, Plaintiff has had a disability because of her COVID-19 disease, and Defendant knew and perceived Plaintiff as having a disability.  Because of Plaintiff's disability, she needed a temporary leave of absence as a reasonable accommodation.  Unfortunately, Defendant instituted a No-Fault Attendance Policy which had an unlawful discriminatory impact on Plaintiff by giving employees points toward discipline, up to and including termination, for absences irrespective of the reason for the absence, including as an accommodation for a disability.  No fault attendance policies, such as Defendant's, violate the FEHA because such a policy does not consider such absences as a protected accommodation.

In addition, both of Defendant's No-Fault Attendance Policy and Incentive Pay Policy are coercive and act to "chill" employees' willingness to exercise their statutory rights for leave as an accommodation because if they do so, they are penalized with points toward discipline and/or lose incentive pay for doing so.

Plaintiff was not only discouraged from using leave as a reasonable accommodation for her disability through Defendant's No-Fault Attendance Policy and Incentive Pay Policy, but her supervisor also discouraged Plaintiff from taking accommodated leave by threatening her that Defendant would not hold Plaintiff's job open if Plaintiff takes leave.  Plaintiff is also aware of management threatening and/or otherwise similarly discouraging other employees from taking accommodated leave with threats of job loss.

_CFRA Interference_

Here, Defendant instituted a "Bonus Appreciation Policy" and an "Attendance Incentive Policy" which cause employees who do not work all hours in a scheduled week to lose incentive pay. Employees suffer a negative consequence for failing to have perfect attendance, even if the sole reason for the failure to perfect attendance is for taking CFRA-protected leave. The incentive pay is not contingent on employees meeting any production goals or quality standards; rather, it merely rewards for the absence of an occurrence (e.g., not being absent for any hours). Under its policies, Defendant took an adverse employment action and denied Plaintiff a benefit for which she was entitled, namely, an incentive payment and bonus, solely because she took CFRA-protected leave.  But for taking CFRA-protected leave, Plaintiff would have achieved perfect attendance and been eligible for the inventive pay and bonus.  Stated another way, Plaintiff suffered a negative

Date Filed: July 22, 2020

1   consequence of losing incentive pay and bonuses for failing to meet Defendant's
2   perfect attendance policies because she was forced to take time under the CFRA.
    As such, Defendant unlawfully interfered with Plaintiff's CFRA rights.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Date Filed: July 22, 2020

1

VERIFICATION

2

3

I, **Ian Pike**, am the **Attorney** in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true.

4

5

On July 22, 2020, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

6

**San Diego, CA**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

-7-
*Complaint – DFEH No. 202007-10749822*

28

Date Filed: July 22, 2020